PREEMPTION DEVICES, INC.

v.

MINNESOTA MINING AND MANUFACTURING CO.

Civ. A. No. 80–0268.

United States District Court, E.D. Pennsylvania.

March 18, 1983.

Zachary T. Wobensmith, III, Wobensmith & Wobensmith, Philadelphia, Pa., for plaintiff.

Joel S. Goldhammer, Seidel, Gonda, Goldhammer & Pautich, P.C., Philadelphia, Pa., for defendant.

## MEMORANDUM

GILES, District Judge.

Preemption Devices, Inc. ("PDI") seeks a declaration that United States Patent No. RE 28,100 is invalid. Minnesota Mining and Manufacturing Company ("3M"), the holder of the patent, counterclaims, alleging infringement. PDI admits that if the patent is valid, it is guilty of infringement. However, in support of the patent's invalidity, PDI raises five arguments: (1) the invention was on sale in the United States for more than one year prior to the application date; (2) the invention was in public use in this country for more than one year prior to the application date; (3) the invention was obvious; (4) the invention was described in a printed publication more than one year prior to the application date and (5) fraud was committed on the Patent Office during the prosecution of the patent. A bench trial was held. The following constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. Background

1. PDI is a Pennsylvania corporation with its principal place of business at 3200 North 17th Street, Philadelphia, Pennsylvania 19140.

2. 3M is a Delaware corporation, doing business within the Eastern District of Pennsylvania, with its principal place of business in St. Paul, Minnesota.

3. This court has jurisdiction and venue is proper.

4. On December 22, 1970, United States Patent No. 3,550,078 was issued to William H. Long for a "Traffic Signal Remote Control System." The original patent application was filed on March 16, 1967. While the application was pending, Long assigned his rights under the patent to Light Energy Systems, Inc. ("LES"). Defendant 3M acquired the assets of LES on July 31, 1968, including the right to the patent.

5. The patent laws give inventors a one year grace period within which to conduct certain activities before applying for a patent. Commencement of this one year period is often referred to as the "critical date." Since the patent application was filed on March 10, 1967, the "critical date" in this case is March 16, 1966.

6. On July 13, 1973, 3M as holder of the patent, filed an application for its reissue. The application was granted and on August 6, 1974 Patent No. RE 28,100 was issued.

7. The patent examiner cited or considered the following prior art during the prosecution of Patent No. RE 28,100:

| Patent Number | Date | Inventors Name |
|---|---|---|
| 3,278,895 | 10/1966 | Pfund |
| 3,257,641 | 6/1966 | Campana, et al. |
| 3,247,482 | 4/1966 | Lesher |
| 3,209,325 | 9/1965 | Mentzer, et al. |
| 3,114,127 | 12/1963 | Ramsey |
| 2,903,674 | 9/1959 | Schwab |
| 2,881,409 | 4/1959 | Cook, et al. |
| 2,457,502 | 12/1948 | Shepherd |
| 2,355,607 | 8/1944 | Shepherd |
| 2,203,871 | 6/1940 | Koch |
| 2,936,387 | 5/1960 | Steele, Jr., et al. |
| 2,173,596 | 1/1939 | Shepherd |

Foreign References

| | | |
|---|---|---|
| 478,924 | 1/1988 | United Kingdom |
| 310,373 | 12/1955 | Swiss |

8. 3M manufactures and sells a system incorporating the invention under the trademark "OPTICOM." This trademark was also acquired from LES. (The invention will be referred to by its trademark, Opticom, for convenience).

9. In 1962, Martha H. Engry and Michael J. Manchester formed Rad-O-Lite of Philadelphia, Inc., which was in the business of developing, manufacturing and selling radio controlled traffic signal remote control systems. In January of 1978, they formed PDI.

10. Shortly after its incorporation in 1978, PDI began marketing and selling a light activated traffic signal remote control system, which admittedly infringes upon the patent.

11. Opticom is a priority device which enables emergency vehicles to control the color shown on traffic lights, in favor of their direction of travel, by phasing the traffic signal through its normal sequence. This allows the vehicle to proceed to its destination without risking intersectional collisions with vehicles approaching from cross streets. A vehicle equipped with Opticom finds the light green in either direction on the street on which it is traveling, with the signal showing red for the cross traffic. The light remains green only for as long as it takes the ambulance, police car or fire engine to cross through the intersection.

12. Opticom is comprised of a light source, a receiver, and computer circuitry. A flashing high intensity light, which flashes at a predetermined pulse rate, is mounted on the emergency vehicle. Both the receiver and computer control module are located at or near the traffic light. They are external to the signal controller. The receiver is sensitive only to the kind of high intensity light emitted from the transmitter. The computer control module is able to sense the phase of the traffic light—whether it is red, amber or green. This is accomplished by circuitry which is connected across the lamps on a traffic light. When a light shows red, the mechanism attached to the red lamp "senses" the increased voltage and the computer, therefore, "knows" that the light is red. The "phase selection" circuitry then commands the controller within the signal to cycle ahead to the desired color.

13. PDI contends that Opticom is little more than an improvement over prior remote control traffic systems. Specifically, PDI points to the teachings of the Shepherd and Ramsey patents, which both predate the Long patent. Through the testimony of their expert, Dr. Arthur Larkey, PDI endeavored to prove that the circuitry and phase selection capability of the Shepherd and Ramsey patents are functionally similar to those of the Long patent. Dr. Larkey is a professor of electronic engineering, having earned a Ph.D. in that field. However, he admittedly has no training or experience in traffic engineering or with remote control traffic devices. By contrast, 3M's

expert, Dr. Parsonson, also a Ph.D., has had vast experience in all phases of traffic engineering, is well versed in various types of traffic control priority systems and has been working with such devices since the mid-1960's. Dr. Parsonson also teaches courses involving traffic engineering, traffic signalization, highway design and computerized traffic signal control. I find his expertise in the area of traffic control devices is far superior to that of Dr. Larkey's and thus his testimony is deserving of additional weight on that subject. I credit Dr. Parsonson's opinion that given the Shepherd and Ramsey patents and the state of the art in the mid-1960's, the innovations made by the Long patent would not have been obvious to a person of ordinary skill in the field.

14. According to Dr. Parsonson, the Shepherd and Ramsey patents do not teach phase selection. I agree and find that both patents teach preemption. The distinction between phase selection and preemption focuses largely upon a device's effect on a traffic signal's internal controller. A preemption device, as its name implies, "preempts" or substitutes another controller for the signal's own internal mechanism. Opticom activates the existing controller within a signal, commanding it to run through its cycle at an accelerated pace. Preemption systems require physical modification of the internal controller of a traffic signal. Phase selection devices are external, leaving the internal mechanisms of signals untouched. Devices built pursuant to the Shepherd or Ramsey patents cannot sense what is the present phase of the light, nor is it necessary for them to do so. Preemption controllers simply take over and change the light to the desired phase. A phase selection device such as Opticom senses the present phase of the traffic light and utilizes the signal's own mechanism to obtain the desired light phase.

15. The Shepherd patent, the earliest of the three, teaches activation by either sound, radio or light, apparently having no preference for any one of the three. However, unlike the Long patent, the suggested light source is not a high intensity lamp, but rather a discharge tube of a suitable gas. By not utilizing high intensity light, there is a substantial risk that a Shepherd device could be triggered by extraneous light sources, such as the sun or vehicle headlights.

16. The Ramsey patent utilizes radio signals. However, radio signals by their nature may cause the triggering of traffic lights on parallel streets. This problem is heightened when an omni-directional signal is used, as by definition, that type of signal is transmitted in all directions. A Ramsey device is activated by pushing one of three buttons, depending upon the direction in which the emergency vehicle is proceeding. A button must be depressed at each intersection and if the wrong one is depressed, the lights will change in a pattern other than the one desired. The operator will have to wait fifteen seconds before pressing the correct button and raise a favoring green light. By contrast, while operating Opticom, knowledge of the direction of travel is not required nor must anything be done at each intersection. Once activated, the system will command each light as the vehicle approaches the intersection, leaving unaffected lights behind the vehicle or on parallel streets.

17. The most crucial difference between Shepherd and Ramsey on one hand and Opticom on the other is what drivers will face at a traffic signal when each is in operation. A system based upon Shepherd will immediately change all four lights red, or three to red with one green, in favor of the emergency vehicle. Ramsey will show two green lights on the street on which the emergency vehicle is traveling and two red lights on the cross street. As an option, it could also be adjusted to show the red lights coupled with flashing amber lights. All of these are abnormal signal patterns. Opticom, however, will go through a normal cycle, and is the only one of the three that will show a full amber phase before turning red. This gives drivers on cross streets sufficient warning of the imminent color change, something which both Shepherd and Ramsey fail to do.

## B. *Opticom's History*

18. William Long, the inventor of Opticom, was an employee of Marshall Laboratories until February of 1965. While at Marshall, Long worked in its military development area on a ship-to-ship optical communication device called Enetron. Enetron utilized high frequency light pulses generated from a gaseous discharge tube. The light pulses were received and converted into electrical impulses. Articles describing Enetron were published during 1964 in *Electronic Industries* and *Popular Science* magazines. However, Enetron was never utilized commercially. The principles behind Enetron were not relevant to the actual invention here—the phase-detection and phase-selection aspects of Opticom.

19. During his tenure at Marshall Laboratories, Long had met G. Wayne King in connection with possible commercial uses for Enetron. After leaving Marshall, Long and King joined with Joseph Miles and Charles Johnson to form the organization, LES, which was not, at this point, incorporated. Long had an idea for inventing a traffic signal remote control device using a light source. LES was necessary for financial, and eventually, marketing aid.

20. LES maintained a desk in Johnson's place of business, Luther Electronics. Armed with supplies purchased by Johnson, Long began work on the remote traffic control project. In the early spring of 1965, the Mark I prototype was completed. It used only a strobe light and light detectors mounted on a simulated traffic signal. When the light flash was detected, the light would turn red. At this point, Long had not made his discovery. The Mark I was merely a primitive preemption device.

21. The Mark II prototype was substantially similar to the earlier model, having only an amber cycle to distinguish it from its predecessor.

22. During April and May of 1965, Long and King traveled throughout Texas, Louisiana and Florida, demonstrating the Mark I. These trips were made in order to gauge the interest in a remote control traffic signal system and to determine if the project was worth pursuing. Long found that there was interest in the concept, but not in a system with the limited capabilities of the Mark I.

23. During May 24–28, 1965, the Mark I was demonstrated to city and fire officials in Gardena, California. Demonstrations of the Mark I and then the Mark II continued throughout the country on a sporadic basis until March of 1966. During these demonstrations, rough price estimates were given to various municipalities, but no firm prices were quoted.

24. On July 20, 1965, LES was incorporated and its first corporate act was to pass a proposal to build a device that could change a traffic light in the same manner as a normal signal—from green to amber and then to red.

25. Long first learned about the internal functioning of a real traffic signal control in mid-summer of 1965. His teacher, Anthony Mihalovitch, was a traffic signal maintenance man from Gardena. Applying this knowledge of traffic light anatomy, Long set out to utilize the "manual switch" within the signal control to create the desired effect. After some trial and error, Long designed a remote control light source system that would sequence the traffic signal to the desired color and hold the phase until the emergency vehicle passed.

26. Parts were ordered on October 27, 1965 and sometime thereafter ten prototypes were built. These shall be referred to as the "black box" models, named after the color of their metal containers.

27. At this point, it was unknown how the models would function in practice. Long did not know what effect the weather, extraneous light sources or wear and tear would have on the prototype.

28. Three black boxes were installed at consecutive intersections in Gardena, California in November of 1965. Four more units were installed in Buena Park, California sometime between December of 1965 and January of 1966.

29. LES bore the expense of the installations of the models. Neither municipality

paid LES any fee for the use of the black boxes.

30. Long received informal reports on how the units were working. On many occasions, officials in Gardena and Buena Park advised Long of malfunctions in the units. Long visited the sites, inspected the devices and took steps to correct any problems, both in the short run and in the long run.

31. Relays in the Gardena units failed and this failure was traced to the presence of sewer gas in the controller boxes. The amplitude controls needed adjustment as the system was subject to being triggered by neon lights.

32. On June 6, 1966, LES applied for a trademark for Opticom. The application listed the first use of Opticom in interstate commerce as December of 1965.

33. The flaws detected in the California units were corrected by various design changes. The new prototypes were housed in anodized gold boxes. This occurred at some point after March 21, 1966 when Long ordered gold boxes. The gold box prototypes replaced their black counterparts in Gardena and Buena Park.

34. At some time prior to March 9, 1966, Long and LES printed sales brochures, describing in an understandable manner, the basic elements and operation of Opticom. Six copies of this brochure were mailed to Leigh Robertson on March 9, 1966, along with a letter. Ms. Robertson, a friend of Long's, worked for and was acquainted with many people of financial influence. Long hoped to induce Robertson to find investors for LES, which was buckling under the financial strain of trying to perfect Opticom.

35. By mid-April of 1966, after further experimentation, Long was satisfied with the performance of the gold boxes. Commercial production became feasible and Long placed an order with a supplier for 200 units.

36. On June 22, 1966, Buena Park bid on 22 units of Opticom. On June 28, 1966, LES responded and the first offer of the invention for sale was made.

37. PDI admits that it manufactures and sells a light activated traffic signal remote control system which infringes upon claims 1, 3, 4, 5, 6, 7, 9 and 10 of the U.S. Patent RE 28,100. PDI also admits that this infringement is willful and intentional.

## II. DISCUSSION

Congress has accorded patents a presumption of validity, placing the burden of proving invalidity upon the party asserting it. 35 U.S.C. § 282 (1976 & Supp.1982). In order to prevail, that party must establish the invalidity by clear and convincing evidence. *See, e.g., Paeco, Inc. v. Applied Moldings Inc.,* 562 F.2d 870, 872 (3d Cir. 1977); *Aluminum Company. of America, et al. v. Amerola Products Corp.,* 552 F.2d 1020, 1024 (3d Cir.1977); *Tokyo Shibaura Electric Company, Ltd. v. Zenith Radio Corp.,* 548 F.2d 88, 93 (3d Cir.1977); *Universal Athletic Sales Company v. American Gym, Recreational and Athletic Equipment Corporation, Inc.,* 546 F.2d 530, 540 (3d Cir. 1976) *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). This presumption of validity is strengthened where the Patent Office has considered the pertinent prior art in issuing the patent, *see Aluminum Company of America,* 552 F.2d at 1024; *Tokyo Shibaura,* 548 F.2d at 93, n. 14, *Universal Athletic,* 546 F.2d at 540 n. 28, or where the Patent Office has had cause to examine the patent and prior art twice, as in a reissue proceeding, *see PIC, Inc. v. Prescon Corp.,* 485 F.Supp. 1299, 1312–13 (D.Del.1980). Both of these elements are present here. The parties stipulated that the patent office considered the Ramsey and Shepherd patents, both of which PDI uses to attack the novelty or non-obviousness of the invention. In addition, the patent has been reissued. Therefore, PDI must overcome a very heavy presumption in favor of the patent's validity. For the reasons which follow, the court finds that PDI has failed to rebut this presumption.

### A. *Sale or Public Use*

Section 102(b) of the Patent Act precludes the issuance of a patent where the invention was "in public use or on sale in this country, more than one year prior to

the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1976). This limitation endeavors to strike a balance between competing interests. It prevents the inventor from using pre-application commercialization to expand the period of monopoly beyond that which is provided in the statute, see *General Electric Co. v. United States*, 654 F.2d 55, 61 (C.C.1981); *CTS Corp. v. Piher Intern. Corp.*, 527 F.2d 95, 102 (7th Cir.1975) *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976), yet affords time within which to determine whether the invention is worth patenting.[1] *General Electric*, 654 F.2d at 61. To further accommodate the inventor, an exception has been carved out for uses which are "experimental," that is, neither a sale or public use will bar patentability if the use is for experimental purposes. *See, e.g., City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 135, 24 L.Ed. 1000 (1877); *DeLong Corp. v. Raymond Intern., Inc.*, 622 F.2d 1135, 1143 (3d Cir.1980).

PDI contends that Opticom was both on sale and in public use before March 16, 1966, the critical date, pointing to the black box prototypes installed first in Gardena in November of 1965 and then in Buena Park, California. 3M denies that Opticom was sold or "on sale" before the critical date. Conceding a public use in Gardena and Buena Park, 3M argues that such usage was merely experimental. Therefore, the court must determine whether Opticom was "on sale" and whether the use was experimental.

■ The "on sale" limitation will bar the issuance of a patent only if the device sold or offered for sale is "substantially identical to that claimed under the terms of the patent." *DeLong*, 622 F.2d at 1141.

Put another way, the invention must be "complete," see *Austin v. Marco Dental Products, Inc.*, 560 F.2d 966, 969 (9th Cir. 1977) *cert. denied*, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978), or "reduced to practice," see *DeLong*, 622 F.2d at 1143, before the sales effort will become a bar to patentability. An invention is "complete" or "reduced to practice" when it functions as it should. The device need not be perfect, but its "practical efficacy and utility must be demonstrated." *DeLong*, 622 F.2d at 1143 (quoting *Van Auken v. Cummings*, 49 F.2d 490, 492 (C.C.P.A.1931).

■ Applying these standards, I find that the patented device was not "on sale" before the critical date. The demonstrations throughout the country could not be construed as an offer for sale—neither the Mark I or Mark II prototypes had phase selection capability. There was not, at that point, a "reduction to practice." The black box prototypes installed in Gardena and Buena Park prior to the critical date also lacked the required "substantial identity" with the patent. The "practical efficacy and utility" of the device had not been demonstrated. On site testing was required to gauge its efficacy and reliability. As a result of this testing, further refinements were needed. I conclude that it was not until the gold box prototypes that there was sufficient identity with the patent to allow a sale to render the patent invalid. Since the order for the gold boxes was not placed until March 21, 1966, after the critical date, there could not have been an invalidating sale of the device covered by the patent before the statutory grace period.[2]

■ An alternate ground supports the patent's validity against both the claims of

---

1. Other policies furthered by the limitation contained in section 102(b) include the desirability of prompt disclosure of new inventions to the public and the attempt to prevent the removal of inventions from the public domain after the public has come to believe that the invention is freely available. *See General Electric*, 654 F.2d at 61.

2. PDI suggests that 3M is estopped from denying that Opticom was on sale because LES

stated that the device was in use "in interstate commerce" in their trademark application in December of 1965. I do not agree. The fact that Opticom was *being used* in interstate commerce, specifically in Gardena and Buena Park, does not affect its patentability, as I have concluded that the units were not on sale. Further, as will be discussed below, the uses in California were experimental.

sale and public use. The use of the device in Gardena and Buena Park was a bona fide experiment. According to the Third Circuit, the experimental use doctrine "allows an inventor a reasonable period of experimentation wherein he may perfect his ideas, provided that the inventor truly has utilized the public use or sale to that laudatory end, not as a competitive tool to exploit his invention and gain an advantage over others." *Paeco Inc. v. Applied Moldings, Inc.,* 562 F.2d 870, 874 (3d Cir.1977). There is a definitional link between the "on sale" bar and the experimental use doctrine. If a device is on sale, generally its use may not be experimental. The *DeLong* court defined "reduction to practice" which is required for an invention to be "on sale" as essentially the absence of the need for further experimentation. The court stated that reduction to practice "is not achieved until the inventor has sufficiently *tested* the prototype to prove its utility and to determine that *no further refinements are necessary.*" *DeLong,* 622 F.2d at 1143 (emphasis added) (quoting *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 279 (5th Cir.), *cert. denied, sub nom., Suaquoit Fibers Co. v. Leesona Corp.,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974)). In addition, a use may be experimental even after the invention is reduced to practice, if it is an attempt to gauge the necessity for further refinements. *See City of Elizabeth,* 97 U.S. at 135–36; *Del Mar Engineering Laboratories v. Physio-Tronics, Inc.,* 642 F.2d 1167, 1169 (9th Cir.1981); *DeLong,* 622 F.2d at 1144; *Poole v. Mossinghoff,* No. 81–1332 slip op. at 6–7 (D.D.C. April 6, 1982).

 In determining whether a use is experimental, a court must look to the inventor's intent. *See City of Elizabeth,* 97 U.S. at 135; *Del Mar,* 642 F.2d 1167, 1169 (9th Cir.1981).[3] I find that it was the intent and purpose of Mr. Long and LES to use Gardena and Buena Park as testing grounds for Opticom. The equipment was installed at the expense of LES and no sale occurred prior to the critical date. The evidence shows that municipal officials reported malfunctions to Long, who came to the site to inspect the malfunctioning units. As a result of these inspections, problems were discovered and alterations made, eventually leading to the use of the gold boxes. The devices originally installed in Buena Park and Gardena were different from the final gold box prototype. An actual "on sight" testing ground was crucial before Opticom could be marketed and sold to municipalities. Many questions remained that could not be answered in a laboratory. Long had to judge the effect of the weather and extraneous light sources, such as the sun, lightening or neon lights on Opticom's receiver unit. If, for example, neon lights could trigger the system, there would be serious reliability problems. Additionally, the effect of wear and tear on the device had to be determined, so that Long could estimate how often Opticom needed recalibration or other maintenance. Without ascertaining Opticom's reliability under operational conditions, it might prove to be a dangerous device, having no practical use.

In *Watts v. University of Delaware,* 622 F.2d 47 (3d Cir.1980), the Third Circuit reversed a lower court's grant of summary judgment on the experimental use issue. Although it did not reach the merits of the case, the court noted that a two week trial period at a college for a type of chair that the inventor was endeavoring to sell might actually be an experimental use. 622 F.2d at 52. No refinements or alterations were made to the chair—the trial model was identical to the patented claim. Moreover, the short term goal in *Watts* was a sale. In contrast, the short term goal of the trial runs in California was to "work out the bugs." A variety of alterations and refinements were made in Opticom. If the use in *Watts* "might" be deemed experimental, the uses of Opticom in California certainly were.

---

**3.** Some courts require proof of both an intent to sell and the communication of that intent to the potential buyer in order to defeat a defense of experimental use. *See Bergstrom v. Sears, Roebuck & Co.,* 599 F.2d 62, 65 (8th Cir.1979); *Poole,* No. 81–1332, slip op. at 5.

Nor does the fact that Long had commercial aspirations alter this view. Inventors obtain patents in order to reap the commercial harvest of their creations. The court in *In re Yarn* noted that when there are dual motivations—experimentation and economic success—the experimental use doctrine will still be available as long as the experimental motivation predominates. *In re Yarn,* 498 F.2d at 288. As the court in *Watts* noted; "the mere desire to realize a profit sometime in the future in no way negates the inventor's intent to test his product in the present." 622 F.2d at 52. Similarly, neither the fact that Long wished to market Opticom at some point or that once perfected, Gardena and Buena Park would hopefully purchase the device, defeats the fundamentally experimental nature of these uses. Thus, I find that the use of Opticom in Gardena and Buena Park satisfies the traditional indicia of the experimental use doctrine.

### B. *Printed Publication*

PDI contends that the patent is invalid as the invention was "described in a printed publication" within the meaning of 35 U.S.C. § 102(b) (1976) before the critical date.[4] Specifically, PDI points to the 1964 magazine articles on Enetron and the Opticom brochures.

■ As the statutory language indicates, in order to serve as a bar to patentability, the invention must be both *described* and this description must be *disseminated* or *published.* Case law has fleshed out the barebones of the statutory requirements. In this Circuit, it has been held that the description must be "a substantial representation of the invention in such full, clear and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent or his own inventive skills." *Universal Athletic,* 546 F.2d at 544; *Philips Electronic and Pharmaceutical Industries Corp. v. Thermal and Electronics Industries, Inc.,* 450 F.2d 1164, 1169 (3d Cir.1971). In

other words, the description must be *so detailed* as to allow someone skilled in the area to replicate the patented device. In addition, the complete description must be accessible to the public. Although it need not be widely disseminated, the description must be "available to 'that class of persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents.'" *Boileau v. Diamond,* 659 F.2d 247, 248 (D.C.Cir.1981) (citations omitted). *See also In re Wyer,* 655 F.2d 221, 226 (C.C.P.A.1981); *Application of Bayer,* 568 F.2d 1357, 1361 (C.C.P.A. 1978). This approach makes sense because only those involved in the area would be able to utilize the information.

■ Applying these standards to PDI's claims, I find them to be without merit. Since Enetron is not related to traffic control, it is hard to imagine the magazine articles devoted to it to be "printed publications" within the meaning of section 102(b). Although the articles described a high intensity light communication system and its possible uses, they did not describe a traffic control device at all, no less with sufficient detail to allow experts in the field to build an Opticom device. The Opticom brochures provide a slightly closer question. As sales literature, these brochures were geared to sell the product to laymen. They described Opticom's components and, in a general and understandable manner, how it performed. However, I do not find that the brochures contained the detail necessary to qualify as a "printed publication" under section 102(b). While the brochures contained the idea behind the patent, they did not include the mechanical information that would allow an expert in the area to create the same or a similar device. Therefore, I conclude that Opticom was not adequately "described" so as to invoke the limitations of section 102(b).

Even if the detail in the brochures was sufficient, I find lacking the necessary public accessibility before the critical date.

---

**4.** Section 102(b) provides that a patent shall be denied if "the invention was patented or described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for a patent in the United States." 35 U.S.C. § 102(b) (1976).

The only evidence of dissemination prior to the critical date of March 16, 1966, was the mailing of six copies of the brochure to Ms. Leigh Robertson on March 9, 1966. Ms. Robertson was a friend of Long's who had access to persons with considerable financial resources but who lacked technical expertise in electronic devices. LES was having financial difficulties and the forwarding of the brochures to Robertson was a desperate attempt to gain some financial backing. No evidence was introduced to show that Robertson was involved in or concerned with traffic control devices or that she disseminated the brochures to anyone who was so involved. Thus, the only dissemination was made harmlessly and without any financial result to one not skilled in the art. *See Boileau,* 659 F.2d at 248; *Wyer,* 655 F.2d at 226; *Bayer,* 568 F.2d at 1361.

■ In *Bayer,* a thesis was held not to be a prior publication even though it was available to three members of the graduate committee and was located in the University library. 568 F.2d at 1361. The members of the graduate committee in *Bayer* had a far greater opportunity and wherewithal to utilize the invention described in the thesis than did Robertson. In addition, the mere presence of the thesis in the library made it far more accessible to the public than did Robertson's possession of the brochures. Hence, I find that the dissemination of the brochures to one person who could make no practical use of the described device was not a "publication" under section 102(b) and does not vitiate the validity of the patent.

### C. *Obviousness*

The 1952 Patent Act added a requirement for patentability which codified early Supreme Court precedent—obviousness.[5] Section 103, the statutory standard of obviousness, provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103 (1976). PDI claims that the Opticom patent was obvious in light of the prior art. Specifically, PDI points to Enetron, the description of Opticom contained in the printed brochures and the Shepherd and Ramsey patents.

■ At the outset, I note that Opticom is a combination patent. That is, each separate element is not a new invention—the novelty lies in their combined effect. The Third Circuit has read recent Supreme Court decisions *not* to require "synergism" in combination patents. *See Rengo Co. Ltd. v. Molins Machine Co., Inc.,* 657 F.2d 535, 544 (3d Cir.) *cert. denied,* 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981). Synergism, plainly stated, is where the sum of the whole is greater than each of the parts or, put another way, the combination has an effect greater than "the sum of its several effects taken separately," *Sakraida v. Ag. Pro, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976). Instead, the Third Circuit treats combination patents the same as any other patent. Since it is comparatively rare in this modern technological world that anything is comprised of totally new elements, this approach appears sound. Inventions more likely arise from the innovative selection of elements or the unexpected result of their combination. *See Rengo,* 657 F.2d at 545. However, even if synergism were required, it would be present here. The combined effect of the

---

5. *See Graham v. John Deere Co.,* 383 U.S. 1, 10–15, 17, 86 S.Ct. 684, 690–92, 693–94, 15 L.Ed.2d 545 (1966). In *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851), the Court held that an invention was not merely the work of a skillful mechanic, but required some additional ingenuity. 52 U.S. (11 How.) at 267. The *Graham* court held section 103 to be the codification of the *Hotchkiss* principle. 383 U.S. at 17, 86 S.Ct. at 693–94.

elements of Opticom is far different and greater than the effect of each of its parts. Thus, the relative obviousness of Opticom must be judged against the same standards as any other patent.

■ In determining whether a patent is obvious, *Graham* suggests a tripartite test. A court must first determine the scope and content of the prior art and then examine the difference between the prior art and claims at issue. Finally, the court should ascertain the level of ordinary skill within the art. *Graham,* 383 U.S. at 17, 86 S.Ct. at 693–94. *See also, Federal Laboratories, Inc. v. Barringer Research Limited and Intex, Inc.,* 696 F.2d 271 at 272–73 (3d Cir. 1982); *American Sterilizer Co. v. Sybron Corp.,* 614 F.2d 890, 893 (3d Cir.) *cert. denied,* 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980). As the Seventh Circuit reflected; "the test of obviousness is whether the invention *as a whole* would be obvious, including the nature of the results obtained." *Novo Industri A/S v. Travenol Laboratories, Inc.,* 677 F.2d 1202, 1208 (7th Cir.1982).

■ PDI argues that Opticom was obvious in light of Enetron. I disagree. Enetron was a communications system whereby high intensity light was transmitted and converted at its destination into electrical pulses of energy. While both the Enetron and Opticom systems utilize the radiation of high intensity light, there the similarity ends. Although Enetron did have a receiver, it lacked the heart of the Long invention—the ability to sense the phase of a traffic signal and sequence the light ahead to its desired phase. Nor did the evidence show that Enetron's technology in any way suggested the phase detection or phase selection abilities of Opticom. Since Opticom is fundamentally different from Enetron, I conclude that Opticom was not obvious.

PDI also claims that the Opticom brochures, which were not considered by the Patent Office, render the device obvious. There is an inherent sophistry in PDI labeling a description of the patented device as "prior art." In addition, as discussed in Part B, *supra,* the device was not described in sufficient detail for the brochures to qualify as prior art.

■ The crux of the obviousness claim focuses upon the Ramsey and Shepherd patents. It was stipulated that both of these patents were considered by the Patent Office—thus a very strong presumption of non-obviousness exists. *See Novo Industri,* 677 F.2d at 1209; *Aluminum Company of America,* 552 F.2d at 1024. PDI had failed to rebut this presumption.

The Shepherd and Ramsey patents are preemption devices. Opticom is a phase selection device. To the extent that preemption is radically different from phase selection, it is difficult to perceive the obviousness argument advanced by plaintiff.[6] At the risk of being simplistic, there are two major distinctions between preemption, the prior art, and the patent at issue which introduces the concept of phase selection. Preemption devices, such as those based upon the Ramsey and Shepherd patents, require actual internal modification or alteration of the traffic signal's controller. On the other hand, a phase selection device can effectuate the desired result without the necessity of physically altering the controller because it is an external device which works in conjunction with the controller. This technological advancement carries practical advantages. For example, the alteration of the original controller can cause problems in determining legal responsibility for an intersectional collision. The manufacturer of the original controller would undoubtedly attempt to absolve itself of liability for defects upon modification. Maintenance could also become a problem since personnel would have to learn the upkeep of a modified controller. Because Opticom does not alter the original controller, the maintenance problem is decreased and the liability problem disappears.

---

**6.** The fact that Opticom is apparently the first "phase selection device" bespeaks lack of obviousness. The record evidence indicated that the idea of "phase selection" was regarded as novel by those in the field.

The second major distinction between preemption and phase selection lies in what occurs at a traffic light. Neither the Shepherd or Ramsey patent has the ability to sense the present phase or color of the light. These devices work on the principle that an oncoming emergency vehicle needs an immediate green light in its favor. When the signal is received, *no matter what the present phase of the signal is,* the light for all oncoming emergency vehicles changes immediately to green. Traffic in the other directions will suddenly see a red or red with flashing yellow, depending upon the system used. In contrast, the Long patent teaches a device that can sense the present phase of the light, determine how to proceed to the desired phase in a normal cycle and execute the change. An amber light will always precede a red. Using Opticom is not unlike a police officer standing at a school crossing and squeezing the manual "grip switch" to speed the light through its normal cycle.

The distinctions and safety features of Opticom can perhaps best be illustrated by an example. Assume an ambulance were traveling in a northerly direction on a street that runs north to south. Assume further, drivers traveling on an intersecting street presently have a green light and as the ambulance approaches the intersection, it activates its priority system. If the device were built pursuant to the Shepherd patent, the light for the intersecting street would turn immediately from green to red. Similarly, if a Ramsey device were used, the light would turn to red or perhaps red coupled with a flashing yellow. In both cases, the driver on the intersecting street would be totally surprised by the sudden change, and he may be traveling at a speed such

that stopping is impossible and collision with the ambulance highly likely. If, however, the ambulance were equipped with Opticom, the driver on an intersecting street would see an amber light of normal duration before seeing a red light.

Other considerations distinguish Opticom from its predecessors.[7] Opticom is easier to operate than the Ramsey system. Once activated, Opticom will automatically change the light at each intersection as the vehicle approaches. The light will remain altered for only as long as required for the vehicle to pass through the intersection. Nor will Opticom alter lights on parallel streets, a frequent occurrence with the Ramsey patent. The operator of a Ramsey device must press the appropriate button at each intersection. This requires constant vigilance, especially with respect to the direction in which the vehicle is traveling. The evidence also indicated that other forms of preemption devices, apparently Shepherd included, are often set up to trigger all of the lights on a given route. Thus, until the device is turned off, all lights on a thoroughfare may show green with all intersecting lights having a red. This unnecessarily snarls the remainder of the traffic, especially if the device is mistakenly left activated. Drivers in this situation may become frustrated thinking that the light is broken, ignore it, once again running the risk of an accident. Finally, a light activated Shepherd device which does not utilize high intensity light, is susceptible to trigger by extraneous light sources. Unlike Opticom, the Shepherd detector might not be able to differentiate between a fire engine and lightening or a neon light. All of these factors weigh heavily in judging the effec-

7. Over 3M's objection, PDI showed a film of the Rad-O-Lite priority system at trial. Rad-O-Lite was the predecessor of PDI. Mr. Charles Eighmy, former director and part owner of Rad-O-Lite authenticated the film and briefly explained the device. Although not mentioned in its trial brief, it was PDI's contention at trial that Rad-O-Lite, which was on the market in 1961, had all of the capabilities of Opticom. Thus, argued PDI, the Long patent was obvious. I disagree. In the first instance, I credit the testimony of Dr. Parsonson who stated that

Opticom's phase selection was novel. He also testified that he had been involved in the traffic remote control device field since the mid-1960's. If Rad-O-Lite had all of the capabilities of Opticom in 1961, Dr. Parsonson would have been acquainted with it when he entered the field a few years later. Moreover, neither the film nor Mr. Eighmy's testimony proved that Rad-O-Lite was anything more than a preemption device in that it was apparently integrated into the circuitry of the controller.

tiveness and reliability of each system. In addition to being intrinsically different from its predecessors, Opticom resolves some of the failings of the earlier priority devices.

Given the varied and fundamental distinctions between the Shepherd, Ramsey and Long patents, I am lead to agree with 3M's expert, Dr. Parsonson. In light of the prior art and level of skill in this field, Opticom was not "obvious" as defined by section 103.

The Supreme Court also enumerated secondary indicia of obviousness, such as "commercial success, long felt but unresolved needs, failure of others, etc., [which] might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 693–94; *L.E. Sauer Machine Company, Inc. v. Corrugated Finishing Products, Inc.,* 642 F.2d 203, 206 (7th Cir.1981); *American Stabilizer,* 614 F.2d at 893. These secondary considerations are, by themselves, insufficient to prove non-obviousness. *Id.* (citing *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.,* 548 F.2d 88, 94–95 (3d Cir.1977)). Opticom has achieved commercial success and is now serving many municipalities. As the preceding discussion indicates, Opticom also solved many of the problems plaguing the earlier priority devices. Perhaps most important, there was need for a device that minimized the danger of accidents occurring as a result of motorists surprised by rapidly changing and abnormal traffic signalling. These considerations buttress my conclusion that the Opticom patent was not obvious.

D. *Fraud in the Patent's Prosecution*

Finally, PDI contends that the patent is void, alleging that Long and 3M defrauded the Patent Office during the prosecution of the Opticom patent application. Specifically, PDI points to Long's failure to bring to the attention of the Patent Office the 1964 magazine articles about Enetron, the alleged public use and sale in California, the Opticom brochures, the Opticom trademark registration, the original demonstration in California and the extensive traveling and demonstrating done by Long and King.

Courts have refused to enforce patents which have been procured by bad faith or fraud. *See, e.g., Precision Instrument Manufacturing Co. v. Automatic Maintenance Machinery Co.,* 324 U.S. 806, 818–19, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945); *Lam, Inc. v. Johns-Manville Corp.,* 668 F.2d 462, 471 (10th Cir.), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982). Within this Circuit it is well settled that fraud must be "proved clearly, unequivocally and convincingly." *DeLong,* 622 F.2d at 1145; *In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601, 603 (3d Cir.1976). *Accord, Oetiker v. Jurid Werke GMBH,* 671 F.2d 596, 600 (D.C.Cir. 1982). The party asserting fraud must prove a misstatement or omission before the Patent Office. The misstatement or omission must be material—something which makes it "impossible for the Patent Office fairly to assess [the patent] application against the prevailing statutory criteria." *In re Multidistrict Litigation,* 540 F.2d at 604 and n. 9 (quoting *Monsanto Co. v. Rohm & Haas Co.,* 456 F.2d 592, 600 (3d Cir.1972)). The Patent Office has adopted a materiality standard which parallels the *TSC v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) standard in the securities fraud area. Information is material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56 (1982). Thus, applicants are not required to disclose everything which "*may* be relevant to *an* issue of patentability." *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 185–86 (8th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977).

In addition to the materiality requirement, some form of scienter must be proven. A negligence standard has been specifically rejected, *see, e.g., DeLong,* 622 F.2d at 1146; *Pfizer,* 538 F.2d at 186, in favor of a requirement of intentional or reckless behavior, *Lam,* 668 F.2d at 471; *In re Multidistrict Litigation,* 540 F.2d at 604.

■ I am not persuaded by "clear, unequivocal and convincing" evidentiary standard that Long intentionally or recklessly made material omissions or misstatements. It may very well be fraudulent to knowingly fail to disclose relevant prior art to the Patent Office or to misrepresent the differences between the prior art and the patent, *see Lam,* 668 F.2d at 471. However, the failure to apprise the Patent Office of the Enetron articles would not fall into this category. Although Enetron utilized high intensity light, as indicated earlier, that was its only real similarity to Opticom. It was not relevant prior art and as such, was not material. Knowledge of these articles would not have had a "substantial likelihood" of being considered important to the examiner in making his decision. In addition, there was no evidence that this omission was intentional or reckless. Assuming materiality, its absence might well have been justified by its apparent irrelevance or an oversight, neither of which rise to the level of fraud.

PDI's argument that it was fraudulent for Long to withhold the information about the public use and sale in California before the critical date loses its vitality in the face of my decision that these uses were allowable experiments. As such, they have absolutely no impact on the issue of patentability. In addition, PDI offered no evidence to show that this omission was intentional as opposed to an oversight.[8] However, even if the uses in Gardena and Buena Park were deemed to be sales, PDI would not have made out a case of fraud, at least in this Circuit. The *DeLong* court stated:

8. The fact that Long included this information in the re-issue application proves nothing. It is possible that he thought he was correcting an earlier oversight.

9. PDI claims that Long misrepresented the number of trips made. In an amendment to the reissue application, it was stated that trips were made to 29 cities, although in the March 9, 1966 letter to Leigh Robertson, the number was placed at 100 cities. The letter to Ms. Robertson was an attempt to gain financial backing for LES. Statements made in this context are often "puffing." In either case, the Patent Office was still apprised of the existence

We hold that without more the mere misstatement in the patent application that there had not been a prior sale of the invention for more than one year prior to the date of the application, particularly when the circumstances pertaining to the transaction required a sifting of the facts, will not support a finding of fraud....

622 F.2d at 1146.

The argument with regards to the Opticom brochures may be answered similarly. PDI suggests that they are material because, as printed publications before the critical date, they would bar the issuance of a valid patent. However, since I have concluded that they were not printed publications within the meaning of section 103, their perceived impact on Opticom's patentability vanishes. No other argument has been suggested or occurs to me why the mere existence of these brochures would be material. Once again, the failure to disclose has not been shown to be reflective of recklessness or an intent to defraud. The same is true of the failure to disclose the trademark application, the demonstrations in California and the number of trips made to determine the amount of interest in a device like Opticom.[9] I do not find that any of these would have affected the patentability of the device[10] or would have been important to the examiner in making his decision. This Circuit has held that an applicant need not give the Patent Office information not requested by the examiner or thought to be irrelevant. *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 676 F.2d 51, 56 (3d Cir.1982). Moreover, I agree with the senti-

of the trips and I do not find the quantitative difference to be material. In addition, during a number of these trips, the demonstrations were of the earlier Mark I prototype, which had not yet incorporated the invention. There is some evidence that Long offered the reports of trips made but the examiner failed to request them.

10. The fact that Long and LES stated in the trade mark applications that the Opticom was in use in interstate commerce in December of 1965 does not vitiate the experimental nature of the uses and hence does not render the patent void. *See* note 2 *supra.*

ments expressed in *Pfizer*, where the Eighth Circuit noted that the infringer;

should not be permitted to side step these main issues by nit-picking the patent file in every minute respect with the effect of trying the patentee personally, rather than the patent. A patentee's oversights are easily magnified out of proportion by one accused of infringement seeking to escape the reach of the patent by hostilely combing the inventor's files in liberal pretrial discovery proceedings.

538 F.2d at 196.

Unable to find any intentional, material misstatements or omissions made to the Patent Office, I conclude that the patent was not procured by fraud.

### III. CONCLUSIONS OF LAW

1. The Opticom patent was not on sale before the critical date.

2. The uses of Opticom before the critical date were bona fide experiments.

3. Opticom was not described in a printed publication before the critical date.

4. Opticom was not obvious in light of the prior art.

5. The Patent Office was not defrauded during the prosecution of the patent.

6. Claims 1, 3, 4, 5, 6, 7, 9 and 10 of U.S. Patent No. RE 28,100 are valid.

### ORDER

AND NOW, this 18th day of March, 1983, for the reasons stated in the foregoing Memorandum, it is ORDERED that JUDGMENT is hereby entered in favor of the defendant and against the plaintiff.

That the plaintiff, its officers, employees and agents, are permanently enjoined from making, using or selling, or offering for sale, light activated traffic signal remote control systems or components in infringement of U.S. Letters Patent No. RE 28,100, specifically including the components of such systems identified and illustrated in the brochures attached as Exhibits to the Complaint herein as "Phase Selector" (Exhibit A), "Two Way Optical Detector" (Exhibit B), and "Optical Emitter Controller" (Exhibit C).

That the defendant recover from plaintiff the damages sustained by the defendant by reason of such infringement. Since infringement has been willful and deliberate, the damages sustained by defendant may be increased by the court following the accounting, in accordance with 35 U.S.C. § 284. Interest may be assessed on the damages, accruing from the date of first infringement by plaintiff.

That the cause be referred to a Master to ascertain the amount of said damages and interest, and that the defendant, on said accounting, have the right to cause an examination of the plaintiff, and also the production of all proper books, vouchers and documents of the plaintiff and that the plaintiff attend for such purposes before the Master from time to time as the Master shall direct. The parties shall submit their proposals for a Master and a proposed order of reference within twenty (20) days of the date of this Order.