**PREEMPTION DEVICES INC.**

v.

**MINNESOTA MINING AND MANUFACTURING CO.**

Civ. A. No. 80–0268.

United States District Court, E.D. Pennsylvania.

Sept. 26, 1985.

Joel S. Goldhammer, Seidel, Gunda, Goldhammer & Abbott, P.C., Philadelphia, Pa., for 3M.

Roger Hewell, Dann Durfman Hewell & Skillman, Philadelphia, Pa., for PDI.

## MEMORANDUM AND ORDER

GILES, District Judge.

Minnesota Mining and Manufacturing Company ("3M") has initiated contempt proceedings against Preemption Devices, Inc. ("PDI"), seeking various court-imposed sanctions for PDI's allegedly willful and knowing violation of the injunction previously issued by this court on April 26, 1983. Specifically, 3M contends that PDI has sold the OE–29 emitter, the OR–1/OR–2 optical detector, and the PSO–1 phase selector into infringing systems. Further, 3M asserts that PDI has made, intends to make, and has sold or intends to sell the LS–164 optical emitter, the OD–155 optical detector, the Model 262 preemption device, and the PD–2 preemptor. 3M claims that the aforementioned devices are the same or substantially the same as the enjoined devices: the OE–29 optical emitter, the OEC–29 optical emitter controller, the OR–2 optical detector, and the PSO–1 phase selector. Since the former devices are not "colorably different" from the latter devices, 3M contends that PDI is in contempt of this court's injunctive order. On the other hand, PDI contends that it has not knowingly violated this court's injunction. PDI contends that 3M has failed to show that the sale of the OE–29, the OR–1/OR–2, and the PSO–1 constitutes contributory infringement. Further, PDI believes that its sale of, or intention to sell, the "new"

devices is not in violation of the injunction because they are more than colorably different from the devices referenced in the injunction and, hence, are not within the scope of the injunction. From June 29 to July 3, 1984, the parties appeared before this court for a hearing on 3M's contempt motion. The court heard testimony and received other evidence. The parties submitted proposed findings of fact and conclusions of law. Based on the record evidence, the court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. *Background*

1. PDI initially brought this action seeking a declaration that United States Patent No. RE 28,100 was invalid. PDI admitted that if the patent was valid it was guilty of willful and deliberate infringement of claims 1, 3–7, and 9–10 of U.S. Patent RE 28,100. *Preemption Devices Inc. v. Minnesota Mining and Manufacturing Co.,* 559 F.Supp. 1250, 1252 (E.D.Pa.1983).

2. In a decision dated March 18, 1983, as amended by order dated April 25, 1983, this court found claims 1, 3–7, and 9–10 of U.S. Patent RE 28,100 valid. In accordance with plaintiff's prior admission, I found that PDI had willfully and intentionally infringed defendant's patent. *Id.* at 1265.

3. On April 25, 1983, this court also issued a permanent injunction providing as follows:

That the plaintiff, its officers, employees and agents are permanently enjoined from making, using or selling, or offering for sale, light-activated traffic signal remote control systems or components in infringement of U.S. Letters Patent No. RE 28,100, specifically including the components of such systems identified and illustrated in the brochures attached as Exhibits to the Complaint herein as "Phase Selector" (Exhibit A), "Two Way Optical Detector" (Exhibit B), and "Optical Emitter Controller" (Exhibit C).

559 F.Supp. at 1265.

4. The scope of the above-quoted injunction is clear on its face. The injunction

addresses both the specific and the general. The order enjoins PDI from making, using, selling and offering for sale PDI's Model PSO–1 phase selector, Model OR–2 optical emitter, and OEC–29 controller in infringement of the United States Patent No. RE 28,100. Generally, it prohibits PDI from making, using, selling and offering for sale any light-activated traffic signal remote control systems or components thereof in infringement of United States Patent No. RE 28,100. *Id.* The "in infringement" language of the injunction is not superfluous. Under section 271(c) of Title 35 of the United States Code, the sale of a non-patented component part of a patented system must fit within the test which it prescribes. In order for the injunction to be violated, the code provisions must be violated.

5. William H. Long, along with Light Energy Systems, Inc. ("LES"), developed a light-activated traffic control device designed to aid emergency vehicles in reaching their destinations. Defendant 3M acquired the assets of LES, including the right to the patent. 3M as the holder of the Long-LES patent, was granted a reissue of the patent—Patent No. RE 28,100. This patent, referred to as the "Long Patent," is the focal point of this lawsuit.

6. 3M manufactures and sells a system which incorporates the Long Patent under the trademark "OPTICOM." As previously concluded, OPTICOM is a priority device which enables emergency vehicles to control the color shown on a traffic light in favor of their direction of travel. 559 F.Supp. at 1253.

7. OPTICOM is comprised of a light source, a receiver and computer circuitry. A flashing high-intensity light, which flashes at a predetermined pulse rate, is mounted on the emergency vehicle. Both the receiver and the computer control module are located at or near the traffic light. They are external to the signal controller. The receiver is sensitive only to the kind of high intensity light emitted from the transmitter. 559 F.Supp. at 1253. The computer control module is able to sense the present phase of the light—red, amber or green. This is accomplished by circuitry which is connected across each of the lamps in a traffic light. For example, when a light shows red, the circuitry attached to the red lamp senses the increased voltage telling the computer that the signal is in the red phase. The phase selector circuitry then commands the signal's own controller to cycle ahead to the desired color. The traffic signal is thereby phased through its normal sequence. *Id.*

8. In the earlier proceedings, I found critical distinctions between the prior art, the Shepherd and the Ramsey patents, and the Long Patent. The Shepherd and Ramsey patents are similar to the Long Patent only in the general goal they achieve: to allow an emergency vehicle easier and more speedy access to its destination. Long differs radically from the Shepherd and Ramsey patents in the method by which it achieves the requisite signal change. The Long Patent is designed to provide a further refinement of the general goal of the other two devices. It allows the vehicle to pass quickly and easily through an intersection but creates less of a danger to the emergency vehicle and cross street traffic.

9. All three patents contain some device external to the traffic signal which triggers the mechanical movements necessary to obtain a green signal for the emergency vehicle when it crosses the intersection. However, unlike the Long Patent which utilizes a high energy light as an activating device, the other two patents use different sources of energy. The Shepherd patent teaches activation by sound, radio or light. 559 F.Supp. at 1254. The suggested light source is not any form of high intensity light, but rather a gas discharge tube. The Ramsey patent, on the other hand, uses a radio signal as its activating force. *Id.* The latter energy sources were, however, not without problem. The Shepherd Device, with its light-activated system, was open to activation by extraneous light sources such as the sun. *Id.* The radio emissions utilized under Ramsey could themselves lead to an accidental triggering

of traffic lights on parallel streets. Furthermore, under the Ramsey patent, the driver of the emergency vehicle must push one of three buttons corresponding to the direction in which he is traveling. Consequently, human error could result in an undesireable light pattern. *Id.* OPTICOM, on the other hand, does not require knowledge of the direction of travel nor discrimination between various directional buttons. *Id.* Also, it does not produce unwanted signal changes on parallel streets nor is it subject to accidental activation by external sources. *Id.*

10. OPTICOM is a "phase selection" device. However, the Long Patent may be distinguished from Ramsey and Shepherd on the basis of the mechanism used to advance the signal to the desired phase. That is, its control module senses the present phase of the traffic signal and its phase selection circuitry then commands the signal's controller to cycle ahead to the desired color. I previously credited the testimony of 3M's expert, Dr. Parkinson, with establishing that the Ramsey and Shepherd patents teach preemption rather than phase selection. In other words, as the name implies, preemption devices preempt the signal's own control mechanism. *Id.* at 1254. Because an external system is used with preemption, physical modification of the signal's controller is required. OPTICOM utilizes the existing controller within the signal, leaving the internal mechanisms of the signal untouched. The introduction of an outside control mechanism further distinguishes preemption devices from the Long Patent. Since preemption devices take over the function of changing signals, they need not have a device which senses the present phase of the light as the emergency vehicle approaches. OPTICOM's computer module on the other hand is able to sense the present phase of the traffic light and utilize the signal's own controller to obtain the desired light phase. 559 F.Supp. at 1254.

11. I found the most critical difference between the Long Patent and the Shepherd and Ramsey patents to be the light patterns displayed at the intersection when these devices are in operation. 559 F.Supp. at 1254. A system based on Shepherd will result in either a display of four red lights, or three red with one green in favor of the emergency vehicle. Under Ramsey, two green lights appear on the street on which the emergency vehicle is traveling, and two red lights or red lights with flashing ambers are visible on the cross street. OPTICOM, however, runs the lights through their normal sequences; that is, green to amber to red. This normal sequencing best accommodates the normal expectation of the drivers on the cross street and, therefore, is less likely to produce sudden stops or accelerations when an emergency vehicle passes. *Id.* This normal sequencing of lights was a major goal of the patent's developer. *See id.* at 1255.

12. The injunction issued by this court was aimed at prohibiting the development, marketing or sale of any system which would infringe upon OPTICOM and its distinct characteristics: a high-energy light source; computer circuitry with the ability to sense the present phase of the traffic light; the use of the signal's own control mechanism to advance the sequence of the light.

13. Prior to the institution of this contempt action, PDI interpreted this court's April 25, 1983 injunction to prohibit it from selling phase selectors but did not prohibit it from selling the emitter or detector which were sold in combination with the phase selector to form an integrated system.

14. PDI believed that it could sell any specific component of the enjoined system regardless of whether the system into which it was to be placed was infringing, as long as it was designated a "repair" or "replacement." (T.Tr. at II–12).

15. PDI sent brochures depicting and describing the LS–164, OD–155 and PD–2 to their distributors. (T.Tr. at I–160). This so-called "market survey" was in reality an offer for sale. Regardless of whether PDI could presently fill the orders, it solicited and accepted requests for these products

after full price quotations from PDI dealers. (T.Tr. at I–14).

16. The brochures make no mention of the injunction and do not speak of any restriction on sales into unlicensed systems nor contain any warning of possible contributory infringement. *See* Exh. 504, 507–508. Furthermore, PDI's dealers were not even advised of the existence of this court's injunction until forced to do so by 3M. (T.Tr. at I–24–25).

17. Under the literature issued by PDI, the OE–29/OEC–29 and the LS–164 are both high intensity light transmitters which are designed to be mounted atop an emergency vehicle where, when activated, they emit pulses of light which in turn activate the optical receiver system. Facially, the LS–164 appears identical except that it is housed in a more modern casing. The only distinction of merit between the two power sources is the power supply itself. The LS–164 works more efficiently because it uses a greater power supply. *Compare* 3M–Exh. C to its motion for contempt *with* 3M–Exh. H. The general management of PDI, Raymond Hurle ("Hurle") testified that the LS–164 and the OEC–29 "do substantially the same thing." (T.Tr. at I–43). Further, Edward T. Coll, an employee of PDI, testified that both devices mount on the emergency vehicle and emit light pulses in the direction of the signal. (T.Tr. at I–63). Other than cosmetic changes, the only difference between the two devices is the emitter; the LS–164 contains a more efficient strobe. (*Id.*) I agree with 3M's expert, Dr. Parkinson, that the devices perform substantially the same functions in substantially the same way to obtain the same result. (T.Tr. at I–86).[1]

18. Under the literature issued by PDI, the OR–2 and the OD–155 are both two-way optical detectors which receive high intensity light pulses transmitted by the emitter and in turn convert these impulses into appropriate electrical impulses. *Com-*

*pare* 3M–Exh. B to its motion for contempt *with* 3M–Exh. G. The product, as depicted in advertising photos, is identical. (*Id.*)

19. The OD–155 has not yet been built. (T.Tr. at I–45). But, when built, its primary intention is to work in a priority traffic control system. (*Id.* at 16). Although the device has yet to be marketed, it could be used in either a phase selection or a preemption system. (*Id.* at 46, 91–98, 118). The OD–155 is not more than colorably different from the OR–1/OR–2 devices. Its function is the same and it obtains the same result in the same way.

20. The PD–1 is nothing more than a PSO–1 with a different face and different instructions. (T.Tr. at I–42). It is no more than a colorable variation of the PSO–1.

21. The PDI–262 discriminator is computer software which performs the same function as the electronic circuitry in the PSO–1. Although the PDI–262 card is an apparent duplicate of the 3M 262 card, the 262 card was not within the terms of the previous injunction. The PDI–262 card performs the same function as *part* of the PSO–1, but does so in a different manner. The 262 and PSO–1 are not equivalents.

22. The PD–2 device employs solid state logic and not electronic circuitry. Although its intended purposes is to be used in conjunction with light-activated priority traffic control systems, it is not equivalent to the PSO–1. The PD–2 is a modified version of the Ramsey preemption system. Although the changes to the Ramsey device bring the proposed PD–2 closer to identity with the PSO–1, the changes to the wiring and the method of entry into the traffic signal controller are more than colorable differences. The functioning of the modified Ramsey device and the PSO–1 are in variance. They are more than colorably different and, hence, are not equivalents.

---

**1.** The finding of equivalence falls within "questions of ultimate fact" and thus constitutes "a mixture of fact and legal precept." *See Interdynamics, Inc. v. Firma Wolf,* 698 F.2d 157, 176 (3d Cir.1982). Therefore, I have included the equivalency test of *Interdynamics* in both findings of fact and conclusions of law.

## II. DISCUSSION

This court issued a memorandum opinion constituting its findings of fact and conclusions of law on the issue of the validity of certain claims of the Long Patent. Since I found the claims of the patent valid, and because PDI had admitted direct infringement if such a finding was made, I issued a permanent injunction prohibiting them from marketing or selling systems or components of systems which infringe the Long Patent. After the injunction, PDI continued its operations, charting a course which it believes eludes the boundaries of the injunctive order. 3M, believing that PDI's post-trial conduct breaches the terms of the injunction, has filed this motion requesting that I hold PDI in contempt.[2]

A party who violates a judicial decree may be subject to the power of contempt. *Interdynamics, Inc., v. Firma Wolf,* 653 F.2d 93, 97 (3d Cir.) *cert. denied, Trans Tech, Inc. v. Interdynamics, Inc.,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (*"Interdynamics I"*). The power of contempts arises from the court's inherent authority to enforce its judgments. *W.J. Usery, Jr. v. Chef Italia,* 540 F.Supp. 587, 590 (E.D.Pa.1982) (citing, *e.g., Ex Parte Robinson,* 86 U.S. (19 Wall) 505, 510, 22 L.Ed. 205 (1873)). Pursuant to the language of 18 U.S.C. § 401 (1976), this court may punish by fine or imprisonment contemptuous behavior, including disobedience of an order lawfully issued. *Interdynamics I,* 653 F.2d at 97.[3]

Because 3M seeks no criminal sanctions, I interpret its motion as one requesting a finding of civil contempt only. A judgment in civil contempt is intended to benefit that party who has complained to the court about the condemnor's recalcitrance by coercing compliance with an order of the court and/or awarding damages for the disobedience of such order. *In re Grand Jury Investigation,* 600 F.2d 420, 423 (3d Cir.1979); *Cromaglass Corp. v. Ferm,* 500 F.2d 601, 604 (3d Cir.1974).

Although civil contempt is a mechanism through which the court may enforce its limited powers, it must not be forgotten that it is a severe remedy. It is for this reason that the movant must prove its case by an elevated standard of proof: clear and convincing evidence. *Nelson Tool and Machine Co. v. Wonderland Originals, Ltd.,* 491 F.Supp. 268, 269 (E.D.Pa.1980). Where there is room to doubt the wrongfulness of the conduct of the defendant, it should not be adjudged in contempt. *See Schauffler on behalf of NLRB v. Local 1291, International Longshoremen's Association,* 292 F.2d 182, 189–90 (3d Cir.1961). However, this court should not hesitate to use its contempt power where there is convincing evidence that the condemnor has "violated his obligations imposed by a court decree by failure of diligence, ineffective control, and lack of purpose in effectuating the requirements of the decree." *Jordan v. Arnold,* 472 F.Supp. 265, 289 (M.D.Pa. 1979), *appeal dismissed,* 631 F.2d 725 (3d Cir.1980).

The requirement that contemptable conduct be shown by clear and convincing evidence is neither diminished nor obviated where the injunction pertains to patent infringement. *See Interdynamics I,* 653 F.2d at 99. 3M correctly argues that the scope our inquiry in this contempt proceeding is defined by the Third Circuit's ruling in *Interdynamics I.*[4] There, the

---

2. Rather than filing a separate infringement action, 3M elected to first bring a suit for contempt. Because this court's power to adjudicate a contempt action arises out of the original course of action, I may not now entertain any claims which exceed the scope of my earlier adjudication. *See LaTrobe Steel Co. v. United Steel Workers of America, Etc.,* 545 F.2d 1336, 1343–44 (3d Cir.1976). Therefore, the disposition of the pending infringement action, which is now currently before me, must await further judicial review.

3. Because PDI's alleged failure to comply with the terms of the injunction would constitute an *indirect* contempt, I allowed a plenary hearing on the issue of noncompliance and, further, granted oral argument on the parties' proposed findings of fact and conclusions of law.

4. Although *Interdynamics I* involved violations of a consent decree, its teaching should apply with equal if not greater force to a proceeding which is based on alleged violations of a court order. *See Interdynamics Inc. v. Firma Wolf,*

court held that, where a party seeks to hold another in contempt for violation of an injunction prohibiting patent infringement, the trial court should apply the "doctrine of equivalents" and determine whether the new product alleged to be in contempt is merely colorably different from the product previously conceded to infringe.[5] *Interdynamics Inc. v. Firma Wolf*, 698 F.2d 157, 160 (3d Cir.1982) (*"Interdynamics II"*). To determine whether the allegedly contumacious product is colorably different from the enjoined device, the court must see if the "two devices do the same work in substantially the same way and accomplish substantially the same result, even though they differ in name, form, or shape." *Interdynamics I*, 653 F.2d at 99 (citing *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)). In a contempt proceeding, the Third Circuit has limited this "equivalency" test to one which simply compares the infringing and allegedly infringing products without reference to the claims of the patent. *Compare In-*

*terdynamics II*, 698 F.2d at 175 *with id.* at 177–78 (Fullam, J., dissenting). The validity and scope of the patent and its claims are not to be rereviewed in a contempt proceeding. *Interdynamics I*, 653 F.2d at 97.[6]

■ The "colorably different" standard serves to distinguish between these cases which are reviewable in contempt proceedings and those actions which are more properly considered in an infringement action. If the party moving for contempt cannot meet the heavy burden of showing that there is a mere colorable difference between the products, it is forced to alternatively pursue an infringement action to obtain relief.[7] This rule would seem to serve at least two purposes: (1) to encourage the producer of the enjoined product to develop a non-infringing product; and, (2) to discourage the patentee from bringing frivolous contempt actions where the new product is more than colorably different yet possibly infringing. Under the *Interdynamics* cases, it is now within this court's discretion to determine whether the

---

698 F.2d 157 (3d Cir.1982), (*"Interdynamics II"*). We are bound by the law of this circuit since the Federal Circuit has yet to rule on this issue.

5. Although it might be argued that the *Interdynamics I* rule is not applicable to an action where contributory infringement is alleged, I am not ready to embrace such an argument. The purpose of the *Interdynamics* cases is to instruct the trial court on the importance of avoiding a full-blown infringement action where contempt has been alleged. If the allegedly contumacious device is only colorably different, it is within the ambit of the previous injunction. I see no reason to ignore the impact of such a rule where a component of an enjoined system is at issue. If the component is more than colorably different from its counterpart, it is not to be tested in a contempt action. On the other hand, if it is only colorably different from the previously enjoined device, then it is not contumacious unless it is placed in a system which is directly infringing. *See* discussion *infra*.

6. In the *Interdynamics* cases, the Third Circuit emphasized that in a contempt proceeding, the trial court should refrain from any inquiry that would require a reevaluation of previously-litigated issues or which would involve a full-fledged infringement analysis. *See Interdynamics I*, 653 F.2d at 98; *Interdynamics II*, 698 F.2d

at 175. Despite PDI's protestations to the contrary, this court is precluded from considering the file history of the Long Patent in *this* action.

However, neither *Interdynamics I* nor *Interdynamics II* specifically prohibits the trial court from making *any reference* to the patent when comparing the allegedly infringing device with the enjoined device under the doctrine of equivalents. Indeed, it is illogical to require the trial court to refrain from *any* reference to the patent. I do not believe that I can adequately discern any distinguishing features of the new PDI products without keeping in mind their infringing counterparts *and* my previous construction of the Long Patent. *See Sure Plus Manufacturing Co. v. Kobrin*, 719 F.2d 1114, 1118 (11th Cir.1983). I will, however, attempt to abide by the Third Circuit's clear mandate that I abstain from any reevaluation of my prior assessment on the issue of infringement.

7. As noted by the Third Circuit, the patentee is rarely faced with a clear violation of injunction prohibiting patent infringement. *Interdynamics I*, 653 F.2d at 97. Rather, it is more likely that "the product at issue in the subsequent proceeding will be in some manner a modified version of the adjudicated products." *Id.* Accordingly, at the outset, the patentee should make a reasoned choice between pursuing either of the two remedies—contempt or infringement.

allegedly infringing devices at issue are best tested in a contempt proceeding or in an infringement action. *McCullough Tool Co. v. Well Surveys Inc.*, 395 F.2d 230, 233 (10th Cir.) *cert. denied*, 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261 (1968); *Siebring v. Charles W. Hanson & AFSCO, Inc.*, 346 F.2d 474, 477 (8th Cir.) *cert. denied*, 382 U.S. 943, 86 S.Ct. 400, 15 L.Ed.2d 352 (1965), *cited in Interdynamics I*, 653 F.2d at 98. It would be an anomolous result to hold PDI in contempt here only to later find that its actions did not constitute infringement. This is particularly so here, where there is an infringement action pending before me which challenges the same devices.

■ If I determine that the allegedly infringing PDI devices are merely colorably different from those previously joined devices or are the same as the previously enjoined devices, my inquiry is not complete. PDI contends that even if the products it sold after the injunction was issued are found to be mere colorable variations of the enjoined devices, such sales are not in violation of the injunction unless they constitute contributory infringement. This theory is based on PDI's contention that this court only enjoined the PDI phase selection system and its components which are "in infringement" of the Long Patent. 3M, on the other hand, maintains that this court's inquiry should end if it finds only a colorable difference between the products. 3M's proposed Findings of Fact and Conclusions of Law at 54. This interpretation appears to be based upon its contention that the injunction prohibited not only the sale of the entire PDI system, but also the sale of the individual components of such system. I find that 3M's contention is without merit. The language of the injunction was based solely upon my factual conclusion that PDI had admitted willful infringement of the Long Patent by manu-

facturing and selling "light-activated traffic signal control *systems.*" *Id.* at 1256 (emphasis added). *See also Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir.1971) (holding that where ambiguity exists, interpretation redounds to the benefit of the person charged with contempt). I previously ruled that the Long device was a "combination" patent because its distinguishing feature was not any of its component parts but rather, the combined effect of its components acting as a system. 559 F.Supp. at 1260. The component parts of such a system, no matter how essential to the combination, do not fall within the monopoly power of the patentee. *Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc.*, 365 U.S. 336, 345, 81 S.Ct. 599, 604, 5 L.Ed.2d 592 (1961) ("Aro I"). Because the component parts are not patented, by operation of law, the injunction could not prohibit the sale of component parts unless such sale is derivative of some direct infringement; that is, there cannot be contributory infringement without direct infringement. *See* 35 U.S.C. § 271(c); *Aro I*, 365 U.S. at 341, 81 S.Ct. at 602. I treat the scope of this portion of my injunction as coextensive with that of 35 U.S.C. § 271(c).[8] *See TWM Manufacturing Co., Inc. v. Dura Corp.*, 722 F.2d 1261, 1269 (6th Cir.1983).

■ Despite 3M's protestations to the contrary, pursuant to Section 271(c) of Title 35 of the United States Code, 3M has the burden of establishing the conjunctive requirement that the contributory infringer (1) knows that the component part is made especially for an infringing use; *and* (2) knows that the component is not a staple article of commerce suitable for any substantial non-infringing use. *See Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc.*, 377 U.S. 476, 488–89 n. 8, 84 S.Ct. 1526, 1533 n. 8, 12 L.Ed.2d 457 (1964) ("Aro II") (indicating that stat-

---

**8.** Section 271(c) provides in pertinent part as follows:

Whoever sells a component of a patented machine, manufacture, combination or composition ... constituting a material part of the invention, knowing the same to be especially made and especially adapted for use in an infringement of such a patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

ute reflects common law which provided for proof of substantial non-infringing use as central part of cause of action for contributory infringement). *Cf. Fromberg, Inc. v. W. Thornhill,* 315 F.2d 407, 415 (5th Cir.1963) (placing burden on defendant to show substantial non-infringing use);[9] *R.W. Sims v. Mack Trucks, Inc.,* 459 F.Supp. 1198, 1218 (E.D.Pa.1978), *rev'd on other grounds,* 608 F.2d 87 (3rd Cir.1979) *cert. denied,* 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980) (requiring that plaintiffs show that defendant had knowledge of both infringing use and that product had no substantial non-infringing use). This conjunctive requirement under Section 271(c) is in effect a single requirement where the requisite intent to infringe contributorily is present. For if a manufacturer sells the component part with the relevancy of a substantial non-infringing use[10] or the fact that an article is a staple is rendered nugatory. Therefore, even if the article has some significant non-infringing use, a manufacturer's knowledge that the component is to be used by an owner of an infringing system is sufficient to meet the burden under Section 271(c). *See Dawson Chemical Co. v. Rohm & Haas Co.,* 448 U.S. 176, 218, 100 S.Ct. 2601, 2624, 65 L.Ed.2d 696 (1980) (stating that when component sold for use in infringing system, article is not staple).

In support of its contention that it has not engaged in infringing activity, PDI cites to the case of *Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc.,* 365 U.S. at 341, 81 S.Ct. at 602. In *Aro I,* a licensee of a combination patent for a convertible automobile roof sought to enjoin Aro from producing or selling an unpatented component, the fabric used to repair the tops. Distinguishing the replacement of *worn* tops, which was a permissible repair of licensed property, from reconstruction of the combination patent, which would have been a direct infringement, the Court ruled that Aro's actions constituted repair and thus were not infringing. 365 U.S. at 341–45, 81 S.Ct. at 602–604. In order for a "reconstruction" to be found, stated the court, the facts must not indicate maintenance of the use of the whole system, but rather, a true reconstruction such as to "in fact make a new article." *Id.* at 346, 81 S.Ct. at 604 (citing *United States v. Aluminum Co. of America,* 148 F.2d 416, 425 (2d Cir.1945).

The holding in *Aro I* was subsequently refined to deal with the "knowledge requirement" of Section 271(c). *Aro II,* 377 U.S. at 488, 84 S.Ct. at 1533. In *Aro II,* the Court held Aro liable for selling fabric to customers who it knew owned convertible tops manufactured by a company who was not licensed to produce the tops. *Id.* at 486, 84 S.Ct. at 1532. Because the manufacture of the tops was unauthorized, the customers' subsequent use or repair of the tops directly infringed the patent. *Id.* Thus, in *Aro II,* unlike the case in *Aro I,* there was direct infringement from which Aro could be held derivatively liable for its sale of components of the combination patent.

In order to establish liability for contributory infringement, the Aro cases mandate that 3M show that PDI had the requisite knowledge that the sale of its components

---

**9.** The differing view of the *Thornhill* court may be due in part to the fact that it was decided prior to the Supreme Court's decision in *Aro II.* Further, the Fifth Circuit may have read the statute as a single requirement; that is, if the complainant shows the requisite intent to contributorily infringe, the non-moving party must show some negative evidence on the issue of intent.

**10.** PDI suggests that each of the components which it has sold or intends to sell has some substantial non-infringing use. It has, for instance, suggested that a form of the optical detector can be used to detect signals to open a home garage door. Such occasional and aberrant use of these products, where they are clearly designed to be used in a system specified in the claims of a patent, does not rise to the level of "a staple article or commodity of commerce suitable for substantial non-infringing use." *Dennison Manufacturing Co. v. Ben Clements & Sons, Inc.,* 467 F.Supp. 391, 428 (S.D.N.Y.1979).

was intended for use in unlicensed systems.[11]

I will now apply the aforementioned law to each of the allegedly infringing components. Since some of the components allegedly sold in violation of the injunctive order are the same devices that are specifically referenced in the injunction, the inquiry as to these devices is limited to whether their sale constitutes contributory infringement pursuant to 28 U.S.C. § 271(c). The doctrine of equivalents does not come into play where actual literal infringement is present. *See Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983).

## A. Offers for Sale and Actual Sales of PDI Devices Specifically Referenced in the Injunction

### 1. *OE–29 Optical Emitter*

■ The OE–29 emitter is a light-energy source which transmits pulses of light at a predetermined frequency. (T.Tr. at I–65). 3M contends that none of the component parts of the previously-enjoined system are staple articles of commerce suitable for substantial non-infringing uses and that the parts were sold with the specific intent that they be used in such systems.

Responding to a request from one of its dealers, Bell & Gustus, PDI shipped an OE–29 optical emitter subsequent to this court's injunctive order. *See* Exh. 623; Exh. 520. The emitter was to be shipped from Bell & Gustus to "The City of Champaign." (T.Tr. at 34). PDI argues, as it does with respect to each device, that 3M has failed to demonstrate that such device was sold by PDI for use with an infringing system. PDI asserts that, irrespective of what type of system the component was ultimately used in, each component was sold as a "repair" or "replacement" item, (T.Tr. at II–11), even if it was not expressly stated in the shipping invoice prepared for the component. Michael J. Manchester, Vice-President of PDI, and admittedly the

person who is the most knowledgeable as to the selling and shipping of PDI traffic system equipment (T.Tr. at I–34), was unaware of the ultimate destination of the OE–29. (T.Tr. at II–12). His sole basis for believing that the filling of the Bell & Gustus order did not violate the injunction was that the injunction did not cover the sale of the OE–29 emitter to the extent it was a "repair" item. (T.Tr. at II–12). My previous order clearly enjoined the sale of the OE–29 emitter, regardless of its use as a repair or replacement item, when it is used in an unlicensed or infringing phase selection system. Ignorance of the law is not an excuse sufficient to avoid contempt. As a corporate officer, Manchester was required to do all that he reasonably could to see that the terms of the injunction were both understood and obeyed. *Jordan*, 472 F.Supp. at 289. It was his official responsibility to control his staff and ensure that ultimate purchasers were notified of the injunction and that such purchasers were not owners of the infringing systems. The injunction applied not only to PDI and its employees, but also to any of PDI's agents. Manchester was aware of the injunction, (T.Tr. at I–21), and could have consulted or did in fact consult with his attorneys regarding the scope of the court-imposed prohibition. (T.Tr. at I–21–22; II–12). I find Manchester's testimony on the issue of his post-injunction motivation to be woefully deficient. He knew that the injunction pertained to the sale of a specific component when sold along with the other components which make up the system. (T.Tr. at I–31). He testified that he did not believe he was prohibited from selling the components individually regardless of the system into which they were ultimately placed. (T.Tr. at I–26–27).

This interpretation would not be so disconcerting if PDI was without representation or the order was written without clarity. However, that is not the case. Despite his protestation that he was acting upon his

---

**11.** Section 271(c) also requires that the component must constitute a "material part of the invention." PDI does not maintain that any of the allegedly infringing components are other than essential components of the system. It is apparent that each component is as a matter of law a *material* element of a light-activated traffic control system.

own interpretation of the injunction (T.Tr. at I–21), Manchester subsequently testified that he acted upon the advice of his counsel. Based on his counsel's representations, he believed that *anything* that constituted "repair" was not in violation of the injunction. (T.Tr. at II–12; II–43). It was Manchester's conviction that he could sell any item as a component as long as he did not sell the system. (T.Tr. at II–43). PDI's understanding of the prohibition was erroneous. PDI is prohibited from selling components into infringing systems. Rather than trying to continue to deplete its stock of OE–29's, (Exh. 645 at 52), PDI should have warned its dealers and/or purchasers of the injunction's prohibitions. Manchester's evasiveness at trial seriously undermines his credibility. He clearly displayed a reckless indifference to this court's order by failing to notify its agents of the injunction. (T.Tr. at I–25); Exh. 645 at 12.

As to the specific OE–29, Mr. Manchester knew that he had previously sold a phase selection system to the City of Champaign, Illinois. This testimony is particularly disturbing. (T.Tr. at II–12). Whether blissful ignorance or willful violation, PDI consciously disregarded my injunction. Based on Manchester's lack of credibility and strong circumstantial evidence, I find that there is convincing evidence that the sale of the emitter was contumacious. The sale was in conscious disregard to the injunction prohibiting contributory infringement.

### 2. *The OR–1/OR–2 Optical Detector*

The OR–1 and OR–2 ("OR devices") are the same device for the purposes of this action. *See* (T.Tr. at I–45). The OR devices are designed to detect light impulses as part of a light-activated traffic control system. (T.Tr. at I–45). 3M has shown that PDI sold OR devices on two occasions after the injunction was issued. (T.Tr. at I–29–32; II–40–41). Although two PDI invoices reveal that the detectors were sold to two of its dealers, Brown Traffic Products, Inc., and Bbuddco, they do not indicate the name of the ultimate purchaser. Unlike the sale of the OE–29 emitter, there is confusing evidence as to whether the ultimate destination of the OR devices was an infringing system. In response to the question of whether Fargo Electric had been previously sold a phase selector system, Manchester replied, "No, sir, I did." This is either stenographic error or a sign of an untruthful statement. Regardless of the import of this statement, evidence as to the ultimate purchaser of the OR devices was solely within the control of PDI. Based on the evidence before me, 3M has adequately shown that there is no relevant market for the OR devices apart from use in phase selection systems which it had previously sold. Without proper evidentiary support, this court will not infer that a holder of a 3M system would purchase component parts from PDI. PDI's Vice-President did not testify that the systems were other than phase selection. Rather, he stated that if push came to shove, he would willfully violate the terms of the injunctive decree. (T.Tr. at I–24). Based on the affirmative evidence submitted by 3M and the negative inference to be drawn from the company executive officer's testimony, I find that there is convincing evidence that PDI acted with conscious disregard for the judicial prohibition against contributory infringement when it sold the OR devices.[12]

12. 3M also asks this court to hold PDI in contempt for its "offer for sale" of the OR devices. Under the injunction, an offer for sale of components of a system which is infringement of the Long Patent is prohibited. The fact that PDI has made an offer for the sale of a component does not negate the necessary intent to violate the injunction. I cannot find PDI in contempt where it did not evince, at a minimum, a conscious disregard for the terms of the injunction. The fact that PDI made several offers for sale, but did not fill such orders for fear of violating this court's order, places an even higher burden on 3M to show the requisite mal-intent. Here, 3M has failed to adduce evidence that the various purchase orders placed in exhibit at trial were solicited by PDI employees. Moreover, there is no evidence in the record of any intent or conscious disregard for the court's order because PDI's unrefuted testimony is that they did not intend to fill these orders. This is not to say that the actions of PDI were not in fact violative

### 3. *The PSO–1 Phase Selector*

3M alleged that PDI has sold and offered for sale the PSO–1 phase selector in violation of the injunction. The phase selector products which were actually sold to and accepted by PDI's clients were the so-called PD–1. Because the only record evidence shows that the PD–1 devices were to be used for a purpose other than phase selection, they must be tested under the principles of *Interdynamics I & II. See* discussion *infra.*

As to the orders which were accepted for the PSO–1 phase selector contingent upon appellate review of this court's ruling, PDI has displayed a less than even-handed approach. Where PDI consciously warned its clients or potential clients of possible infringement if a PSO–1 were purchased, 3M has not adduced any evidence of contumacious behavior. However, on at least several occasions, PDI did act with a conscious disregard for the injunction where it actually delivered several PSO–1 devices. *See* Exh. 639, Invoice Nos. 243, 250, 251, 252, 254, 255, 262, 263, 264, 296. For example, in responding to Purchase Order No. 83–8752, PDI shipped six optical phase selectors. (T.Tr. at II–29). It was not PDI in this instance that warned the customer of possible infringement if such shipment was accepted. Rather, the customer refused acceptance pending the outcome of the litigation. Unlike the other components, the PSO–1 cannot be used for any substantial non-infringing use. It is a phase selector designed only for use in an unlicensed system. Further, even assuming it could be used in a licensed system, the customer's refusal to accept the devices unless this court's ruling were overturned on appeal is sufficient evidence to conclude that the systems into which the components were to be placed were unlicensed.

Additionally, PDI claims to have made many repairs to existing PDI phase selectors. These repairs vary in price from $40.00 to $91.00. *Compare* Exh. 639, In-

voice No. 251 *with* Exh. 639, Invoice No. 254. Although PDI claims that these items vary in price according to the repair, I find that the actual invoices reflect the sale of phase selectors whose serial numbers were even designated on the invoices. *See, e.g.,* Exh. 639, Invoice No. 262. It appears as though PDI's interchangeable use of "replacement" and "repair" cannot hide the wholesale selling off of excess stock at low cost. *See* (T.Tr. at II–41). Accordingly, I find that PDI acted without proper motive in delivering the PSO–1 devices for sale and, in so doing, violated the terms of the injunction.

### B. Offers for Sale and Actual Sales of PDI Devices Not Specifically Referenced in the Injunction

### 1. *The LS–164 Emitter*

■ Like the OE–29 emitter, the LS–164 is a light energy source which transmits pulses of light at a predetermined frequency. In fact, the LS–164 was intended for substitution with or as a replacement to an OE–29. (T.Tr. at II–18). While PDI argues that the two devices are not equivalents, I disagree.

The literature prepared by a PDI employee, Edward Coll, at the request of Manchester (T.Tr. at I–146), portrays the LS–164 as a virtual clone of the OE–29. *See* Exh. 508. Manchester argues that the LS–164 is a "totally redesigned light." (T.Tr. at II–16). He cites to the fact that it has a greater flexibility of tolerances; is lighter in weight and does not require air cooling. (T.Tr. at II–16–18). However, Coll, who was familiar with the workings of the LS–164 and OE–29 devices, (T.Tr. at I–59), provided testimony which clarifies the alleged substantial modifications. Coll testified that like the OE–29, the LS–164 is mounted on an emergency vehicle and emits pulses of light at a predetermined rate for detection by an optical detector for control of a traffic signal. (T.Tr. at I–53). Coll stated that the LS–164 was an improvement over

---

of this court's order. Rather, it is only my conviction that 3M has not carried its burden of

proof.

the OE–29; "it's stable, it's smaller, [and] it's more efficient." (T.Tr. at I–65) (brackets added). Further, he stated that with an adjustable mount and reduction in weight, it provides a better looking alternative. (*Id.*)

3M presented the testimony of its expert witness, Dr. Peter S. Parsonson, who is an expert in the field of traffic engineering, and a full professor of civil engineering at Georgia Tech. (T.Tr. at 71). Parsonson unequivocally testified that the LS–164 performs the same function as the OE–29 in substantially the same way to obtain the same result. (T.Tr. at I–86). Raymond Hurle, PDI's own general manager, did not disagree. (T.Tr. at I–43). PDI's dealers even believed that the devices were to be interchangeable. *See* Exh. 645 at 52. Furthermore, neither Parsonson nor Hurle indicated any substantial non-infringing use beyond its possible use in a preemption system.

The changes in the LS–164 are merely cosmetic. A change in weight, size and physical appearance does not necessarily mean that products are other than equivalents. The fact that the LS–164 is programmed to provide a different pulse rate than that previously used in the OE–29 is insignificant. The power to program is within the hands of the owner/seller in both cases. (T.Tr. at I–120). I credit Dr. Parsonson's testimony, as buttressed by the testimony of PDI employees, with establishing that the LS–164 and the OE–29 are designed to interface with an optical detector by emitting pulses of light at a predetermined rate to accomplish the same result: triggering of the optical detector which in turn sends electrical current to in turn advance the traffic signal to the desired phase.

Because the cosmetic changes to the OE–29 have resulted in the only colorably different LS–164, I must now determine whether the sale or offer for sale of such a device violated the terms of the injunction.

3M alleges that PDI has made at least two shipments of LS–164 emitters. *See* Exhs. 510, 520. PDI does not contest the fact of sale, (T.Tr. at II–19), but rather contends that the devices were sold for the repair of systems which it had not sold. (T.Tr. at 19–20). In a contempt action, the burden is on the movant to produce clear and convincing evidence of disobedience. Here, while the circumstantial evidence is strong, I am not prepared to state that it is enough to lead to an inexorable conclusion that PDI acted with a conscious disregard of this court's order.

My conclusion with regard to PDI's marketing efforts is, however, without doubt or hesitation. Manchester asserts that it prepared brochures for its new devices as part of a "marketing survey." (T.Tr. at I–14). Through a direct mailing, PDI sent brochures to municipalities and dealers throughout the country describing their new equipment. PDI even quoted prices on these goods to various dealers. (T.Tr. at I–14–15). For example, the brochure on the LS–164 describes a device virtually identical to the OE–29 and does not mention that this device cannot be used in conjunction with an infringing system. *See* Exh. 508. In fact, the leaflet does not reference any non-infringing use. *See* (T.Tr. at I–118–19). Further, rather than restricting its mailing of brochures to a manner reasonably calculated to reach the ultimate user who does not own an unlicensed system, PDI conducted a mass mailing without regard for the restrictions issued by this court. *See* (T.Tr. at I–14–15). Several dealers, who looked to Manchester for clearance when they submitted orders for PDI products, *See* Exh. 643 at 13; Exh. 645 at 11, were not even aware of the injunction when they received purchase orders generated from PDI's advertising campaign. Exh. 642 at 9; Exh. 643 at 36; exh. 645 at 12. The reckless behavior of PDI led to confusion at each level in the purchase-and-sale chain. After the so-called survey brochures were mailed, orders were submitted for PSO–1 devices. The avowed purpose of the survey was to see if the consumer of priority traffic systems would accept preemption vis-a-vis phase selection. (T.Tr. at I–16). If it was

the goal of PDI to determine customer preference, it's so-called "survey" was not only poorly performed, it was deceptive. Moreover, it is not in compliance with the terms of the injunction which prohibits the offering for sale of components which would constitute contributory infringement. Although PDI believes that its obligation under the injunction is limited to abstinance from specified conduct, I do not agree. Apart from restraint, PDI was and is under a continuing obligation to take affirmative steps to comply with the terms of the injunction.

First, PDI was obliged to determine the significance of the injunction through their counsel. This was either not done or PDI received erroneous legal advice, for it was PDI's belief that by denominating a sale of a replacement items as "repair" it could avoid a breach of the order.

Second, once it understood the scope of the prohibition, it had the duty to warn its employees, dealers and ultimate consumers of the potential hazard of direct infringement. The blissful ignorance exhibited by PDI with regard to the end-users cannot be countenanced. To allow unwitting purchasers and/or dealers to be drawn into the vortex of a direct infringement suit is to nullify the policy behind the issuance of a judicial decree prohibiting contributory infringement.[13]

### 2. *The OD–155 Optical Detector*

Although the OD–155 optical detector had been built at the time of trial, PDI admits that it was not for sale. (T.Tr. at I–23, 146). Even though it was not techni-cally ready for sale, PDI's descriptive literature and PDI's dealers make clear a present intention to build and sell the OD–155. (T.Tr. at I–13–14, 57, 146). PDI admits that its primary intention is to use the OD–155 in priority traffic systems. (T.Tr. at I–46). PDI does not contest the similarity between or even the identical appearance of the devices. *See id.* Both devices appear facially the same. *Compare* Exh. B to 3M's motion for contempt *with* Exh. 507. Further, PDI does not challenge the identity of their function—to detect flashes of light emitted by an energy source and to, in turn, provide an identical electrical pulse to the preemptor or phase selection device. (T.Tr. at I–45, 58–59). PDI's only defense to 3M's assertion that the OD–155 is only colorably different from the OR devices is that it did not and does not intend that the OD–155 device be used with an infringing system.

Under *Interdynamics I & II*, I must compare the products side-by-side. They are identical in shape and form. I credit Dr. Parsonson's testimony with establishing that the devices function in substantially the same way, to accomplish the same result. (T.Tr. at I–85). In so doing, I reject PDI's argument that their intent to market the OD–155 for use only in preemption systems renders the device more than colorably different from the OR devices. The OD–155 performs exactly the same function (to directionally detect the presence of high intensity flashing light from an OE–29 or LS–164 optical emitter) in exactly the same manner (a light detector housed in a directional weather-proof con-

---

**13.** I find that the "marketing survey" performed by PDI is nothing more than an offer for sale. There is little if no evidence that the offers for sale were even presented to customers in the guise of a survey. There are no questionnaires; in fact, there are no questions. The brochures, when viewed in conjunction with the price quotations offered by PDI, *See* (T.Tr. at I–161), are invitations awaiting acceptance. As stated by Mr. Budd, the president of one of PDI's dealers, even though we have not entered orders, even though we have not received a purchase order, it still does not negate the fact that we are moving down the path and saying, "Hey, this and this and this are all basically available."

Exh. 643 at 36. The survey was understood by PDI's dealers to be in reality a sales pitch. Further, there is record evidence that return invoices which were part of the so-called "survey" were made a part of the survey *after* they were returned by the customers with the expectation that they would *really* be filled. *See* Exhs. 626–27. Mere surveys are not performed in this manner. Furthermore, the propriety of the "survey" is drawn into question because some of the dealers and all of the ultimate purchasers were unaware of the court's injunction. *See* Exh. 645 at 12; Exh. 643 at 36; Exh. 642 at 9. Accordingly, I decline to accept PDI's "marketing survey" theory.

sole and aimed in a selected direction) to accomplish exactly the same result (to convert the light flashes into corresponding electrical pulses) as the OR devices.

I must now examine the offer for sale of these devices to see if there has been a violation of the injunction. The brochure prepared and circulated by PDI detailing the function and appearance of the OD–155 indicates that the device is for use with "preemption devices." The brochure does not restrict the use of the device to non-infringing systems—in fact, by reading the quoted material the user of a PDI phase selector might well think the OD–155 is merely the new replacement for the old OR devices. The dealers were not warned of the possible liability of purchasers with infringing systems. Moreover, the dealers were not even told that the OD–155 had not yet been built. *See* Exh. 642 at 43. One dealer specifically stated that he knew the price of the new equipment and was actively recruiting its sale. Exh. 642 at 46. He even quoted prices given to him by Manchester. Exh. 642 at 54. This again points to the deceptive nature of PDI's "survey." Further, the fact that the City of Memphis ordered twenty-five OD–155 detectors, *see* Exh. 525, and PDI made a contingent acceptance of such order, indicates that the "survey" was viewed by the end users as an offer for sale. *See* (T.Tr. at I–35). Although there is no record evidence as to the type of traffic control system in Memphis, I find that the marketing or offering for sale of the OD–155 without proper warning to its dealers and customers is in conscious disregard for the injunction. PDI is under a duty to take affirmative steps to ensure compliance with the injunction and cannot rely on mere chance to insulate itself from the effects of this court's contempt power.

### 3. *The PDI–1 Device*

On at least two occasions, PDI shipped what it refers to as "closure machines" to two of its dealers. *See* (T.Tr. at I–36; II–11, 29). These devices were apparently made up especially for these orders and were then shipped by PDI. No sample or mock-up was provided by PDI at trial. Further, there is no expert testimony on the relationship between these devices. Therefore, I must determine whether these devices are colorably the same as the PSO–1 solely on the basis of the testimony of two employees of PDI, Manchester and Hurle. My task would be easy if they were in substantial agreement, but they are not. Hurle testified that the only difference between the PD–1 and the PSO–1 is the front plate and the directions on its use. (T.Tr. at I–42). Hurle testified that the electrical circuits and all connections are the same when it is employed in a priority system. (T.Tr. at I–43).

Manchester, on the other hand, adheres to the position that the PD–1 has no phase selection circuitry and "activates the controllers or preemptors by the manufacturer." (T.Tr. at II–11). This is the sole shred of evidence to support PDI's contention that there is a colorable difference between the two devices. I find that PDI's argument that the PD–1 "closure" was designed for use as a mere relay switch defies simple logic and is contradicted by the record evidence.

Hurle, who demonstrated the greatest familiarity with the PD–1, contradicted Manchester's testimony. Hurle's testimony is unequivocal that the PSO–1 plus a new cover and different directions equals the PD–1. (T.Tr. at I–42). Further, his statement that the electrical circuitry is the same in both devices was without hesitation. (*Id.*)

Manchester's testimony is not only confusing, his credibility is undermined by the record evidence. When PDI sold PD–1 devices to the City of Williston, North Dakota, it was responding to a "bidders proposal" for phase selection equipment. *See* (T.Tr. at I–35). The Williston specifications clearly call for a "preemption device" which contains phase selection circuitry. *See* Exh. 526. One must ask why the town of Williston would accept a device with phase selection circuitry to fill its order if it were to use the modified PSO–1 as a relay

switch. Further, why would it contact PDI and pay PDI for a more complex device than was required to use any present system which it held.

The invoice received from the sale and shipment of several PD-1 devices to Bell & Gustus is also instructive. Exh. 520, Invoice No. 267. While the invoice refers to a "Pre-emption Device PD-1," it is unclear exactly what this designation means. Right below this designation three other PD-1's or PD-1 component parts are listed. The invoice, when viewed as a whole, reads like the sale of an entire optical phase selector system. If the equipment is sold together as a unit, the circuitry, which is phase selection, must correctly operate in phase selection.

PDI also admitted that when it shipped three "closure machines" to Brown Traffic Products, it shipped six optical phase selectors. This sale was in response to a general request for preemption equipment. (T.Tr. at II–29). It would seem inconsistent for the ultimate purchaser to obtain six PDI optical phase selectors while simultaneously purchasing three "closures" for use with its existing equipment. Again, it defies logic that a purchaser would obtain PSO-1 circuitry solely for use as a relay switch. The closure machine, with its cosmetic variations from the PSO-1, must function in phase selection. My conclusion is buttressed by the fact that the customer for the PD-1 shipped to Brown Traffic Products returned the devices out of fear that they would violate this court's injunction. (T.Tr. at II–11).

In sum, I find that the PD-1 and the PSO-1 vary in only cosmetic detail. Further, the devices function as equivalents, providing the circuitry to advance traffic signals via phase selection when working in conjunction with the other components of the previously-enjoined system. Accordingly, the sale of the PD-1 into unlicensed systems is tantamount to contributory infringement and is thus in contempt of this court's injunction order.

## 4. *The 170 Controller/262 Discriminator*

The 262 device is a plug-in priority control module designed for use with the Model 170 traffic signal controller. (T.Tr. at I–47); Exh. 503. The 170-type controller uses a pre-programmed microcomputer whereas the previously-enjoined system employs an electromechanical traffic signal controller. (T.Tr. at I–73). Rather than using electronic circuitry to obtain traffic movement function, the 170 uses a software program. (*Id.*) The 170 contains an input file with preprepared slots ready for insertion of printed circuit boards. (T.Tr. at 125). The 262 discriminator software is plugged into the 170 input file on one end, (*id.*), and is connected to the optical detector on the other end. (*Id.*) The 262 device provides power to the detector. (T.Tr. at I–77). The 262 circuitry determines whether or not it has received a valid signal from an emergency vehicle and, if the signal is valid, it provides output to the controller to effect the necessary signal movement. (T.Tr. at I–65). The 262 is used in conjunction with the standard light emitter, such as the OE–29, or LS–164, and the standard light detector, such as the OR devices or the OD–155. (T.Tr. at I–49).

3M manufactures a 262 discriminator for use with its OPTICOM system. Exh. 634. The 3M 262 devices was not the subject of the prior patent infringement suit. It is apparent that the PDI device is similar, if not identical to the 3M device. *Compare* Exh. 503 *with* Exh. 634. It is true that PDI may have copied the 3M device. *See* (T.Tr. at I–66–67). PDI did, in fact, mimic the 3M 262 brochure in advertising its product. *Compare* Exh. 503 *with* Exh. 634. However, it is not my function to compare these two devices. Rather, the PDI 262 device must be compared with the PSO-1 device to see if it is more than colorably different.

Under *Interdynamics I*, the new product must be tested against the previously enjoined product to see if it is an equivalent. In this case, the 262 device is used with a controller which is not even sold by PDI. The various manufacturers of the 170 con-

troller supply the states of New York, California and Oregon. (T.Tr. at I–73). By admission of 3M's expert witness, the 262 device, when isolated from the 170 controller, is not capable of controlling the traffic signal in phase selection. (T.Tr. at I–121). The 262 card is a software program and not a controller. (*Id.*) The PSO–1 is both a discriminator and a controller. The 262 card performs only part of the function of the PSO–1. Further, the 262 performs the discrimination function through computer circuitry while the PSO–1 performs such function through electronic circuitry. Under *Interdynamics I*, this is the "greater efficiency" which exceeds the boundary of "merely colorable." *See* 653 F.2d at 99.

It would appear that the 170/262 combination as used pursuant to the California specifications operates in phase selection. (T.Tr. at I–126; II–31). Moreover, it would appear that the 262 accomplishes the same result as that portion of the PSO–1 circuitry which performs the discrimination functions.[14] However, the 262 device accomplishes this result in a substantially different manner. The computer software is not electronic circuitry.[15] Without the 170 controller, software alone is insufficient to obtain the result accomplished by the PSO–1.

The *Interdynamics* cases stressed the importance of demarcating the boundary between contempt and infringement. *Interdynamics I*, 653 F.2d at 97–98; *Interdynamics II*, 698 F.2d at 175–76. This court should not be drawn into a controversy which requires deep exploration into the mechanical operation of a device which was not envisioned to fall within the scope of the injunction. While the offer for sale of the 262 card may in fact constitute infringement, it is more than colorably different from the specifically enjoined PSO–1. Because it is not an equivalent to the PSO–1, the offer for sale or sale of the 262 device is not contemptuous.

### 5. *The PD–2 Device*

The PD–2 "preemption" device had not been built for sale as of the time of trial. (T.Tr. at I–15). The PD–2 is in the stage of concept design—there are only blueprints of the proposed circuitry and a mock-up showing its probable physical appearance. The designer of the PD–2, Edward Coll, testified that the device was far from its final form—it could be changed if he so desired. (T.Tr. at I–56). The fear of problems in converting the design to manufacture was of serious concern to PDI's dealers. *See* Exh. 643 at 20. There is further evidence that the design of the PD–2 is not final. Manchester testified that the PD–2 is going to be the equivalent to its old Rod-O-Lite 6500. (T.Tr. at I–16). This is contrary to the testimony of PDI's expert, Dr. Fegley, who testified that the PD–2 is a modern version of the Ramsey preemption device. (T.Tr. at I–203). This lack of certainty over the design of the PD–2 gives me cause for some concern as to the sufficiency of the feared contempt. However,

14. Dr. Fegley, PDI's expert, testified that the 262/170 combination works in phase selection. (T.Tr. at II–63). While I do not challenge the fact that the 170 device may be programmed to operate in phase selection, I do not agree that in this case, the sale of the devices was not for use in phase selection systems. Dr. Fegley is unfamiliar with the actual operation of the 262/170 devices and the PSO–1 phase selection system. *See* (T.Tr. at II–76). His opinion is not based on a review of the California specifications which the devices were allegedly designed to meet. *See* (T.Tr. at II–62). As a consequence, his understanding of the actual working of the devices is deficient.

15. 3M argues that the mere substitution of computer circuitry does not mean that a subsqent product is not an equivalent to a previously-adjudged infringing device. *See Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1365 (Fed. Cir.1983). While I do not disagree with 3M's contention, it has no application in this proceeding. First, the *Hughes* decision is not a *per se* rule. Rather, whether two products are equivalents must be determined on a case-by-case basis. Further, the *Hughes* court found equivalency in an infringement action. There, the court had the full resources available in an infringement action. It was not limited to the simple comparison of devices mandated by *Interdynamics I & II* and was thus able to explore the scope of the patent in question. In the context of this contempt action, I find that the substitution of computer software is a substantial alteration of function which renders the devices non-equivalents.

based on PDI's immediate intention to build the device and its present ability to do so, I conclude that 3M's apprehension over the sale of the PD–2 is reasonable.

PDI has demonstrated an ability to quickly adapt to change. This is evidenced by their ready ability to develop, market and sell the LS–164, OD–155 and the 262 discriminator. *See* Exh. 642 at 15. Further, PDI has exhibited an immediate intention to build and sell the PD–2 device once this court rules on the contempt issue. The PDI brochure describing the PD–2, coupled with the fact that they allowed their dealers to solicit sales for such devices, is ample evidence of the company's present intention and ability to build and sell the PD–2.

Much like the situation in *Interdynamics I and II,* PDI has expressed its intention to begin production if judicial clearance is given. *See Interdynamics II,* 698 F.2d at 173. The "premature" PD–2, as it is now intended to be marketed, has been designed. *See* (T.Tr. at I–142). Further, PDI, like Trans Tech in *Interdynamics,* has solicited and received orders for this device which it intends to sell if clearance is given. *Id.* at 173–74. Accordingly, I conclude that there is an "actual controversy" as to the PD–2.

The lack of vision as to the actual PD–2 to be manufactured does not make the task of comparing these devices easy. On the outside, a comparison of the proposed PD–2 and the PSO–1 reveals an identity of housing. *See* Exh. 504. In fact, the housing is what PDI refers to as a "universal housing." *See* (T.Tr. at I–145). The PD–2 casing portrayed in the PD–2 brochure was designed to appear like the PSO–1 such that the consumer would think the devices interchangeable and thus not be frightened away from purchasing the PDI product. *See* (T.Tr. at I–40). The only cognizable change which appears in the brochure depicting the device is the addition of a PD–2 sticker placed over the old PSO–1 sticker. (T.Tr. at I–55). The essence of the alleged changes contained in the PD–2 product are internal to the mechanism—the cover is not necessarily indicative of the contents.

The PD–2 is clearly envisioned by PDI to be a substitute for the PSO–1. It is intended to be compatible with a light-activated priority traffic control system; that is, it is to function in conjunction with a light emitter and an optical detector. (T.Tr. at I–58). However, it is PDI's contention that although the system is designed to provide aid to emergency vehicles by giving them priority at a traffic-signal controlled intersection, the PD–2 performs this function in a substantially different way from the PSO–1.

Dr. Fegley, a professor of engineering at the University of Pennsylvania, testified that the PD–2 functions in a substantially different way from the PSO–1. (T.Tr. at I–173). He stated that whereas the PSO–1 works in phase selection, the PD–2 works in preemption. (T.Tr. at 173–74). Fegley described the PD–2 as the Ramsey preemption device with solid state logic substituted for electromechanical circuitry. (T.Tr. at I–203). Specifically, he believes that the PD–2 cannot sense the present phase of the light as the PSO–1 can. Fegley also believes that the PD–2 substitutes a controller for the traffic signal's internal controller. (T.Tr. at I–185).

3M's expert, Dr. Parsonson, testified that the PSO–1 and the PD–2 are equivalents. (T.Tr. at III–28–29). Parsonson believes that the only difference between the two devices is the addition of solid state logic to the PD–2. (T.Tr. at III–29). Parsonson testified that the PD–2 does not disable both the manual and the automatic internal controls of the signal as did Ramsey. Rather, he stated, the PD–2 effectively uses the manual °switch to get through to advance the ratchet motor, much like the PSO–1. (T.Tr. at 24–27). Further, Parsonson stated that by removing line W and cams 45, 46 and 47 present in the diagram, representing the bottom half of the Ramsey device and marked Exhibit P–9, PDI has eliminated any unusual display of lights that might appear on the street opposite that on which the emergency vehicle is approaching. (T.Tr. at III–28).

In reviewing the testimony of both experts, this court is left with the impression that more questions were created at trial than answered. I agree with 3M's contention that PDI has removed essential elements from the Ramsey patent. I conclude that the PD-2 does indeed provide a normal sequencing of lights to the motorists at the intersection. *See* (T.Tr. at III-28). Further, it appears that by removing cams 45, 46 and 47, the PD-2 has substantially altered the external control mechanisms present in Ramsey. This fact was admitted by Dr. Fegley upon cross-examination. (T.Tr. at II-94). Dr. Fegley's testimony is further undermined by his lack of knowledge of the PSO-1 controller. (T.Tr. at I-99). It is difficult to accept as true his belief that the two devices function differently without his having a firm understanding of the mechanical operation of the previously-infringing device.

However, what is troubling is PDI's belief that the PD-2 renders the signals over manual and automatic controllers inoperable. (T.Tr. at III-51). PDI asserts that the use of the manual/automatic switch of the signal's own control mechanism is an integral function which distinguishes the Long Patent from Ramsey. To understand the changes to the Ramsey device proposed by PDI, I must go beyond a mere examination of the two products. A simple comparison of the PD-2 and the PSO-1 reveals solid state logic and circuitry in the PD-2 which is foreign to the PSO-1. However, to understand properly the differences created by these changes I must in turn reexamine the claims of the Long Patent in light of its file wrapper history. It would be both unequitable and unwise for this court to adjudge the PD-2 in contempt only to find subsequently that it is not an infringing device. The teaching of *Interdynamics I & II* counsels against a finding of contempt where the devices are more than colorably different. In this case, the PD-2 and the PSO-1 perform substantially the same function (to discriminate emergency vehicle signals and to, in turn, advance the lights) to obtain substantially the same result (to advance the lights in the direction of the emergency vehicle to green while providing a normal sequencing of the lights on the cross street). However, comparing the circuitry and logic of the proposed PD-2 and the enjoined PSO-1, they do not do so in substantially the same way.

This is not to say that the PD-2 is not in infringement of the Long Patent. Rather, it is only to say that the products are not equivalents for the purposes of this contempt action. I am not at liberty to compare and contrast the claims of the Long Patent with the PD-2. Further, I cannot reexamine the claims of the Long Patent in light of its prosecution history. Without these resources, a ruling of contempt in this action would be equal to an ill-informed finding of infringement. Based on the record before me and the existence of a separate infringement action pending before me, I refuse to hold PDI in contempt for what is a good faith effort, whether successful or not, to avoid infringement.

## III. CONCLUSIONS OF LAW

1. PDI's offer for sale and sale of the OE-29 emitter for use in unlicensed systems was in conscious disregard for the terms of the injunction prohibiting contributory infringement and is, therefore, contemptuous conduct.

2. PDI's offer for sale and sale of the OR devices for use in unlicensed systems was in conscious disregard for the terms of the injunction prohibiting contributory infringement and is, therefore, contemptuous conduct.

3. PDI's contingent offer for sale of PSO-1 phase selectors for use in an unlicensed system was in conscious disregard for the terms of the injunction prohibiting contributory infringement and is, therefore, contemptuous conduct.

4. The LS-164 and the OE-29 emitters are colorably the same. They perform substantially the same function in substantially the same way to obtain the same result. As equivalents, PDI's offer for sale of the LS-164 emitter for use in unlicensed systems was in conscious disregard for the terms of the injunction prohibiting contrib-

utory infringement and is, therefore, contemptuous conduct.

5. The OD–155 optical detector and the OR devices are colorably the same. They perform substantially the same function in substantially the same way to obtain the same result. As equivalents, PDI's offer for sale of the LS–164 emitter for use in unlicensed systems was in conscious disregard for the terms of the injunction prohibiting contributory infringement and is, therefore, contemptuous conduct.

6. The PD–1 and the PSO–1 perform substantially the same function in substantially the same way to obtain the same result. They are colorably the same. As equivalents, PDI's sales of the PD–1 device for use in unlicensed systems was in conscious disregard for the terms of the injunction prohibiting contributory infringement and is, therefore, contemptuous conduct.

7. The PDI 262 discriminator is more than colorably different from the PSO–1. The 262 discriminator obtains one of the same results as the PSO–1, but achieves this result through different means. Accordingly, PDI's offer for sale and sale of the 262 device is not in violation of the injunction.

8. The PD–2 device is more than colorably different from the PSO–1. Although both devices achieve the same result, they do so in a different manner. Accordingly, PSI's offer to sell and its intention to sell PD–2 is not in violation of the terms of the injunction.